```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                       CASE NO. 13-20914-CR
3         UNITED STATES OF AMERICA,        Miami, Florida

4               Plaintiff,                 June 19, 2014

5            vs.                           2:37 p.m. to 4:31 p.m.

6         DAMION ST. PATRICK BASTON,       Courtroom 12-2

7               Defendant.                 (Pages 1 to 69)

8         ──────────────────────────────────────────────────────

9                    JURY TRIAL EXCERPT - DAY 4
                BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                    UNITED STATES DISTRICT JUDGE
10

          APPEARANCES:
11

12         FOR THE GOVERNMENT:    OLIVIA S. CHOE, ESQ.
                                  ROY ALTMAN, ESQ.
13                                Assistant United States Attorney
                                  99 Northeast Fourth Street
14                                Miami, Florida 33132
                                  (305) 961-9437
15                                Olivia.choe@usdoj.gov

16         FOR THE DEFENDANT:     DAVID P. ROWE, ESQ.
                                  Law Office of David P. Rowe
17                                110 E Broward Boulevard
                                  Suite 1700
18                                Fort Lauderdale, Florida 33131
                                  (305) 731-0019
19                                DavidRowe28@gmail.com

20
           REPORTED BY:          STEPHANIE A. McCARN, RPR
21                                Official Court Reporter
                                  400 North Miami Avenue
22                                Twelfth Floor
                                  Miami, Florida 33128
23                                (305) 523-5518
                                  Stephanie_McCarn@flsd.uscourts.gov
24

25
```

1                          I N D E X

2

3                          DIRECT   CROSS   REDIRECT   RECROSS

4    WITNESSES FOR THE GOVERNMENT:

5    Frank Ochberg              26      41        50        --
     (On Qualifications)         3

6

7    WITNESSES FOR THE DEFENDANT:

8                              --      --        --        --

9


10

     EXHIBITS MARKED & ADMITTED IN EVIDENCE   MARKED      ADMITTED

11

12   Government's Exhibit No.                   --          --

13

     Defendant's Exhibit No.                    --          --

14

15

16                         MISCELLANEOUS

17                                                         Page
     Proceedings.........................................   3
18   Court Reporter's Certificate.......................  59

19

20

21

22

23

24

25

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

```
 1        (The following proceedings excerpt were held at 2:37 p.m.)
 2            THE COURT:  Ladies and gentlemen, please be seated.
 3            Dr. Ochberg, please raise your right hand.
 4                    (Time 2:37 p.m.)
 5                    FRANK OCHBERG,
 6   a witness for the Government testified as follows:
 7            THE WITNESS:  Yes.
 8            THE COURT:  Please be seated.
 9                    DIRECT EXAMINATION
10                    ON QUALIFICATIONS
11   BY MR. ALTMAN:
12   Q.  Dr. Ochberg, good afternoon.
13   A.  Good afternoon.
14   Q.  Would you please state your name and spell it for the
15   record?
16   A.  Frank Ochberg, O-C-H-B-E-R-G.
17   Q.  Dr. Ochberg, where did you grow up?
18   A.  In New York City, near the George Washington bridge.
19   Q.  And where do you live now?
20   A.  Now, I live in Michigan.
21   Q.  And when did you get here to Miami?
22   A.  It seems like I have been here all year.  I got here about
23   five days ago.
24   Q.  All right.  Dr. Ochberg, would you tell the jurors, please,
25   where you went to college?
```

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

```
 1   A.   I went to Harvard University.

 2   Q.   And what did you major in?

 3   A.   History and literature of England.

 4   Q.   When did you graduate?

 5   A.   1961.

 6   Q.   And did you graduate with honors?

 7   A.   Yes.

 8   Q.   Where did you go to medical school?

 9   A.   Johns Hopkins Medical School.

10   Q.   When did you graduate from Johns Hopkins?

11   A.   1965.

12   Q.   Would you tell the jurors where you worked after Johns

13   Hopkins Medical School?

14   A.   I was an intern in medicine and surgery at the United

15   States Public Health Service Hospital in San Francisco.

16   Q.   What is the United States Public Health Service Hospital?

17   A.   Back then, we had a Department of Health, Education and

18   Welfare, the "H" was the United States Public Health Service

19   and we had seven hospitals around the country.

20   Q.   And how long were you there?

21   A.   One year.

22   Q.   Could you tell the jurors what a residency in medicine is?

23   A.   Well, in my generation, you had to take an internship first

24   and then you would take a training program in a medical

25   specialty.  My medical specialty was psychiatry and I was a --
```

 1    what's called a psychiatric resident at Stanford.

 2    Q.   And how long were you at Stanford?

 3    A.   Three years.

 4    Q.   What years were those?

 5    A.   1966 through 1969.

 6    Q.   And could you tell the jurors what the difference is

 7    between psychology and psychiatry?

 8    A.   Psychiatrists are medical doctors and can prescribe

 9    medication.   Psychologists are Ph.D.'s, they write a thesis,

10    they also get training but they don't have the medical

11    background.

12    Q.   And at some point later in your career, and we will get to

13    that, at some point later in your career, did you end up doing

14    another fellowship?

15    A.   I did.   In the mid-70s, I had what's called a forensic

16    psychiatry fellowship and -- do you want the details of that

17    now or later?

18    Q.   We don't have to go into it now, but just tell the jurors

19    where it was.

20    A.   It was in London and I was assigned to work with Scotland

21    Yard and with the Institute of Psychiatry at the University of

22    London.   And it was -- you will hear a little bit about that

23    later.

24    Q.   And what is Scotland Yard?

25    A.   The Metropolitan Police, the famous police force.

1    Q.  For London?

2    A.  For London.

3    Q.  Like Sherlock Holmes?

4    A.  I don't think he was a member.

5    Q.  All right.  Where did you go after you finished your

6    residency at Stanford University?

7    A.  I joined the U.S. Public Health Service in a part that's

8    called the National Institute of Mental Health and that's

9    really the mental health part of the federal government, as

10   opposed to the health part.

11   Q.  And how long were you at the National Institute of Mental

12   Health?

13   A.  Ten years.

14   Q.  And could you tell the jurors how your role progressed in

15   those ten years?

16   A.  Yes, I started out as an assistant to the deputy director,

17   he became the director, I became the executive assistant to the

18   director, which was still a -- an entry-level position.  I

19   became the West Coast mental health director and then a

20   director of something called the Division of Mental Health

21   Services.  So I was responsible for community mental health and

22   phasing out hospitals for the United States.

23       It was around that time that I had an additional assignment

24   and I became the representative to the National Security

25   Counsel dealing with counterterrorism.  And I also was

1    appointed to an attorney general's task force to study

2    terrorism and disorder, but particularly to pay attention to

3    hostage negotiation, the techniques, training FBI agents and

4    other law enforcement officers on how to conduct conversations

5    with people who are holding hostages.  And it was during that

6    time that I was sent to work with Scotland Yard and with the

7    psychiatry program in London.  And it was all about bringing

8    together mental health techniques and insights and refining the

9    skills of people who were negotiating in deadly situations.

10   Q.  Now, after ten years at the National Institute of Mental

11   Health, what was the highest position that you attained?

12   A.  I ended up as the associate director, which was the number

13   two or three position at the time.  There also was a year when

14   I was detailed from the public health service to spend a year

15   with the U.S. Secret Service.  And that was because the

16   director wanted to be sure that somebody with my background was

17   helping him reduce and eliminate sources of stress to the

18   agents of the Secret Service.

19   Q.  And so what kinds of things did you do as second or third

20   in command at the National Institute of Public Health?

21   A.  I was responsible for Congressional relations and dealing

22   with the different mental health constituencies.  I would

23   testify before Congress, I'd help get legislation renewed that

24   we felt was a benefit to public mental health.

25   Q.  And after ten years at the National Institute of Mental

```
 1   Health, you decided to move on?

 2   A.  Yes, I was recruited by the governor of Michigan to join

 3   his cabinet as the -- in some states it's called commissioner.

 4   My title was director of mental health and I was responsible

 5   for mental health, mental retardation, the forensic center, 26

 6   hospitals.

 7   Q.  And could you tell the jurors, just briefly, what you did

 8   in that role?

 9   A.  That was a tough time.  That was a time of budget collapse.

10   I had to do the best I could while laying off 5,000 people but

11   being responsible for the services of the state.

12   Q.  And what year was that?

13   A.  That was 1979 through 1981.

14   Q.  Now, after you left the Department of Health -- the

15   Michigan Department of Health, where did you go from there?

16   A.  I worked with a Catholic order called the Sisters of Mercy

17   who wanted me to help them direct their mental health service,

18   but also gave me an opportunity to establish the first

19   residential treatment program for victims of violence.  And I

20   did that for three years.

21   Q.  And could you talk about that a little bit?

22   A.  Well, I expected that many, if not most, of the residents

23   would be women and they were.  And they were survivors of

24   incest, of battering, of rape, and many were survivors of all

25   three together and this was relatively new.  We had just begun
```

Case 1:13-cr-20914-CMA Document 124 Entered on FLSD Docket 09/23/2014 Page 9 of 69
Cross-examination of Michael Berlin, Ph.D.
June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

9

1  to have a diagnosis called posttraumatic stress disorder and I

2  was helping to develop treatment for people who had

3  posttraumatic stress disorder.

4  Q.  What we know as PTSD today?

5  A.  Yes.

6  Q.  And what was your involvement in the -- in the evolution of

7  PTSD as an accepted diagnosis?

8  A.  I was part of the team that wrote the diagnosis, modified

9  the diagnosis.  So it is my generation and my colleagues, we

10 didn't really discover it, it was there, but we put it

11 together.  And that's been a deep interest of mine.

12 Q.  Now, during the course of your time with the Sisters of

13 Mary (sic), did you do any work with, as you mentioned, victims

14 of trauma?

15 A.  Yes.  That was the time in my life when I was not in the

16 executive role or administrative role.  I had patients, I

17 admitted them to the hospital, I was responsible for their

18 care, I had staff that I supervised and I got to know these

19 people rather well.

20 Q.  And we are going to talk about these concepts in more

21 detail in a moment but did you encounter and treat, during that

22 time, people who demonstrated the symptoms of trauma bonding?

23 A.  Well, there's a -- there's a term called Stockholm syndrome

24 and there is a term, now, that is coming into use called

25 "trauma bonding."  I didn't invent the word Stockholm syndrome

1    but I am the person who is credited with defining it.  And I

2    did that before we had the PTSD concept.  And that was based,

3    first, on a case that -- should I go ahead and just mention it?

4    Q.  Go ahead?

5    A.  It happened back in 1973, there was a bank robbery in

6    Stockholm, Sweden.  And the original robber, instead of just

7    robbing the bank, brought weapons in and held four tellers

8    hostage, got everyone else out of the bank, demanded that a

9    colleague of his be released from prison and brought to the

10   bank.  So these six people, two perpetrators, four hostages,

11   stayed there for almost a week.

12       And, unbelievably, one of the hostages falls in loves with

13   one of the hostage holders.  Subsequently, she's denied that it

14   really was love but she broke off an engagement.  She was on a

15   phone call to the Prime Minister of the nation demanding that

16   he pay attention to what these bank robbers wanted.  And there

17   clearly was a relationship.  The robber reciprocated.  He had

18   positive feelings back.

19       When I was working with the FBI at the time and we realized

20   we had to take that into account.  The FBI wasn't involved in

21   that case but many subsequently.  So when you are trying to

22   resolve a deadly situation, preserving life, and the hostage is

23   not your friend on the outside for a period of time but is

24   bound emotionally to that hostage-taker, doing what is asked to

25   be done, even to the point of feeling loving feelings, that

1   became known as the Stockholm syndrome.  So we have to look for

2   it, understand it.  It isn't all that logical and maybe later

3   on, I will tell you why I think it happens.

4        Trauma bond includes the Stockholm syndrome but also the

5   battered woman.  She isn't suddenly captured, but she is in a

6   relationship where she may be beaten, she may be raped by a

7   husband, a partner, and despite that, she stays.

8        There are other situations of trauma bonding where one

9   person has a lot of power, a lot of authority, and the other

10  ends up being subservient, obedient, almost like a pet dog that

11  has been trained to do the master's bidding.  And often this

12  bond involves sudden unpredicted abuse, violence and then just

13  the opposite.  Sudden unexpected gifts, apologies, positive

14  things.  Back and forth like that, can create what we now call

15  a "trauma bond" and Stockholm syndrome is one unusual way that

16  it can happen.  Battered -- a battered wife is another

17  circumstance.

18  Q.  All right.  And we will talk a little bit about those in a

19  moment.

20       Dr. Ochberg, you are also a part-time clinical professor;

21  is that right?

22  A.  Yes, I have the title clinical professor of psychiatry at

23  Michigan State University.

24  Q.  And could you talk to the jurors a little bit about what

25  you teach at Michigan State?

1   A.  I teach this set of subjects, particularly how to treat

2   posttraumatic stress disorder.  I introduce the concepts to the

3   medical students and I teach it to the psychiatric residents.

4   Q.  Now, in addition to all of this work, do you also maintain

5   your own private practice in psychiatry?

6   A.  Yes, I see patients in an office.

7   Q.  And how long have you been doing that?

8   A.  Well, I have been doing that since medical school at least

9   part time, except for the years when I was the mental health

10  director of Michigan when, by law, I was not allowed to have a

11  private practice.

12  Q.  And do your patients -- are they strictly in Michigan or

13  are they --

14  A.  No.  Now, because this is real special area, there are

15  people who consult with me from other countries, or other parts

16  of the United States and, thanks to Skype and the Internet, I

17  am doing more that way.

18  Q.  And over the course of your four decades, almost, as a

19  clinician, have you treated people who have been involved in

20  abusive relationships?

21  A.  Yes.

22  Q.  Have you treated people who have been involved in

23  physically abusive relationships?

24  A.  Yes.

25  Q.  And have you treated people who have been involved in

1    sexually abusive relationships?

2    A.   Yes.

3    Q.   And have you treated people who have been involved in

4    psychologically abusive relationships?

5    A.   Yes.

6    Q.   And have you treated people who have been involved in what

7    you consider morally abusive relationships?

8    A.   This is a very interesting new term and it's important to

9    our servicemen and women who are coming home who do what they

10   have to do as soldiers, marines.  But sometimes they are in a

11   situation, like you are in a convoy and you run over a child

12   and you had no choice.  And it is a moral injury and these

13   become very deep injuries.  And so a lot of my colleagues call

14   it that and we are doing what we can to help people who have a

15   strong sense of conscience and of duty but who feel that they

16   have done something that was terribly wrong.  And you don't

17   simply say, oh, you couldn't have avoided it.  You have to help

18   work with that.

19   Q.   Would you give an estimate to the jurors about how many

20   patients, over the course of your career, have you treated who

21   have been involved in the kinds of abusive relationships we

22   have been describing?

23   A.   Well, certainly hundreds directly, and then as supervisor

24   of a clinic where I review charts that psychologist and social

25   workers have where they need a psychiatric signature, I did

1    that for five years.  So I would have been exposed to thousands

2    of situations like this.

3    Q.  And in reviewing those charts, are you just reviewing them

4    or are you also helping these psychologists and therapists and

5    social workers with their work?

6    A.  Yes, I am reading their notes.  I am signing quarterly

7    summaries or annual reports.  And where I see something that I

8    think is a problem or that needs follow up, I call them up

9    right away and talk about the case.

10   Q.  Have you also treated patients who -- against whom force or

11   threats of force or coercion has been used to get them to

12   engage in prostitution?

13   A.  Yes.

14   Q.  Now, I want to talk for a little bit about your work on

15   committees and associations and task forces.  Could you tell

16   the jurors what the American Psychiatric Association is,

17   please?

18   A.  Well, most people have heard of the AMA, American Medical

19   Association.  The specialties have their own groups and the

20   American Psychiatric Association is a group of psychiatrists

21   who pay their dues and who join committees and who consult with

22   one another about best practice.

23   Q.  And have you been involved with some of their committees

24   and task forces?

25   A.  Yes.  I -- I have been a member of several committees and

1   task forces.  I have chaired a few and I was the chair of

2   something called the Counsel of National Affairs which was over

3   and helping to sponsor and develop the minority committees.

4   There was a committee of black psychiatrists, Asian American,

5   Hispanic and I had those various roles.  I think my favorite

6   role was after that, the women asked me if I would join the

7   committee on women, so I think I am the only male psychiatrist.

8   Q.  What was that like?

9   A.  I learned a lot.  Thank you.

10  Q.  And what kind of work did you do on the committee on women?

11  A.  Well, it was serious work.  There were efforts at times to

12  put certain diagnoses on the books that might be prejudicial

13  against women, like hysterical personality disorder, and we

14  picketed and we kept that out.  There was a time when we

15  brought Gloria Steinem to the convention to tell the

16  psychiatrist some truths about women and gender differences.

17      Women, I believe, played a major role, also, along with the

18  military in helping to define PTSD.  Because being traumatized

19  actually happens more to women than to men and, in my

20  experience, the diagnosis came out of listening to and learning

21  the truth about what happens when people are raped or battered

22  or diminished in dignity and in sense of humanity.

23      That's a relatively new field and concept that a victim has

24  a pattern of suffering and it changed into a type of behavior.

25  And while they were not mentally ill to begin with, they have

1    symptoms that need attention.

2    Q.  Could you talk a little bit about the task force on

3    victimization?

4    A.  That was the task force prior to defining posttraumatic

5    stress disorder that looked at victim issues and that helped

6    create the diagnosis.

7    Q.  And what was your role there?

8    A.  I chaired that.

9    Q.  And I also want to talk about some of the organizations and

10   you mentioned that you had been involved with -- you mentioned

11   one earlier and so I think we should get to it now.  Could you

12   talk to the jurors about the National Task Force on Terrorism

13   and Disorder and your work for them?

14   A.  Yes, we were a group of about ten of us.  I was the only

15   psychiatrist, mental health person, most had police or law

16   backgrounds.  And we were commissioned after the Munich

17   massacre in the Olympics in 1972.  And we particularly wanted

18   to ensure the federal government and the state governments and

19   counties and cities that our police forces could respond to

20   terrorism and particularly the hostage variety of terrorism.

21       We were titled "terrorism and disorder," but we focused

22   very, very much on hostage negotiation, on developing SWAT team

23   tactics, on developing better relationships between law

24   enforcement and the media, because these events can demoralize

25   a city or a country.  And we ended up writing a 600-page report

1  with standards and goals for different government organizations

2  throughout the country.

3  Q.  And could you talk about whether there was a time during

4  your work on that task force and your work with the FBI where

5  you traveled around and interviewed victims of kidnappings, of

6  trauma, of hostage takings?

7  A.  I -- I had helped write a book when I was a resident at

8  Stanford and there was an FBI agent on that task force on

9  terrorism who read that book and we became close friends.

10  Nobody read that book other than my relatives and Conrad

11  Hassel.  It led me through a personal relationship and then

12  becoming, I guess I would say, acceptable to the FBI to work

13  with them, be sponsored by them and by the Public Health

14  Service, to have a year overseas based in London but travelling

15  around Europe and interviewing people who were held hostage.

16      So I interviewed the senior magistrate from Rome who was

17  held by the Red Brigades.  I interviewed the editor of the

18  largest paper in the north of Holland who was held by a

19  Moluccan terrorist group.  I interviewed people who were held

20  in the Spaghetti House siege that was managed by Scotland Yard.

21  It was a range of people, different circumstances, but it was

22  out of that that this Stockholm syndrome definition and some of

23  the methods to work these cases evolved.

24  Q.  Now, could you tell us about your work for the

25  International Society for Traumatic Stress Studies?

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1  A.  Well, if psychiatry is a specialty within medicine,

2  there -- since 1980, has become a specialty within psychiatry

3  and psychology and social work of the doctors, the

4  psychologists, the therapists, the social workers who work with

5  people who have been traumatized.

6      Now, we have common K.L. diagnosis, we are learning

7  better and better ways to help somebody who has gone through

8  those kinds of life-shattering events.  And the International

9  Society for Traumatic Stress Studies is the professional

10 organization of the researchers and the practitioners.

11 Q.  And what was the nature of your work with them?

12 A.  I was one of their founders and I have been a member.  I

13 give papers or symposium.  In 2003, I received their highest

14 honor which is called the lifetime achievement award, so it's

15 conferred by peers of one of their members.

16 Q.  And during the time of your work, would that association --

17 do you and the other members discuss issues like trauma bonding

18 and the Stockholm syndrome?

19 A.  Yes.

20 Q.  And battered woman syndrome?

21 A.  Yes.

22 Q.  And ways to combat it and treat it?

23 A.  Yes.

24 Q.  What is the Michigan Victim Alliance?

25 A.  That's a group that was generated from survivors of crime

1   in Michigan, along with a few like myself who were advocates

2   for them or who provided services, and it has been in existence

3   for 30 years.  It is relatively small.

4       What it does, now, is it goes to the medical school, the

5   law school, the criminal justice classes.  And people who have

6   survived rape, parents of a murdered child, man who was shot

7   and survived and man who was there when his fiancee was killed

8   in front of him in his house, they, now, are the board of

9   directors and they are teaching from their experience.

10  Q.  And what kind of work do you do for them now?

11  A.  I -- I helped raised money for them.  At times, I served as

12  an adviser.  Now, I think of myself as a friend.

13  Q.  What is the National Center for Victims of Crime?

14  A.  Well, there are a couple of national organizations that

15  lobby for victim services, that try to protect the budget of

16  those agencies, that distribute money to victims of crime.

17  They hold conventions where victims of crime meet providers of

18  services to victims.  There is something called the -- the

19  Victim/Witness Advocate and this organization helps develop

20  bonds among those practitioners and bring important information

21  to them.

22  Q.  And what is the Michigan Crime Victim Services?

23  A.  By the way, I am on the board of directors of that last

24  organization.  The Crime Victim Service Commission, every state

25  has; Florida has one too.  And this is usually appointed by the

1    governor.  And it is a body of four or five or six people and

2    they oversee the agency that distributes funds to victims of

3    crime.

4        Depending on state law and federal law, they are eligible

5    for funeral benefits, if your family member is murdered; for

6    therapy and medical services if you are injured in the course

7    of a crime.  There are some eligible expenses.  I served on

8    that commission appointed by the governor for five years.

9        And we would also serve as a review board, if someone felt

10   they deserved compensation but the appointed staff disagreed.

11   They would bring it to us and we would sit as a court to rule

12   on eligibility.

13   Q.  And during the course of your time there, did you encounter

14   women who had been in battered relationships?

15   A.  Yes.

16   Q.  And sexually abused?

17   A.  Yes.

18   Q.  And physically abused?

19   A.  Yes.

20   Q.  And psychologically abused?

21   A.  Yes.

22   Q.  Could you talk a little bit about what the Dart Center for

23   Journalism and Trauma is?

24   A.  Well, first, Mr. Dart, who died recently, was a

25   philanthropist.  And I knew that family and they knew my

1  interests.  And they helped me establish several programs.  One

2  of them that is rather unique and, I think, important began in

3  Michigan within the journalism school to teach journalism

4  students about covering victims in a sensitive way.  And it

5  evolved and it moved and it, now, is located at Columbia in New

6  York, with offices in Australia and in London.  And it is of,

7  by and for journalists who cover crime, violence, catastrophe,

8  anything that's traumatic.  And it is to help the journalists

9  get the story right but also recognize, like our military, like

10  police, like any first responder, the journalist gets

11  traumatized, too.  And it's taken awhile to recognize their own

12  emotional wounds.  Now, they are getting better at seeing it

13  and caring for one another.  I have developed and I have served

14  as the first chair of the center.

15  Q.  Dr. Ochberg, are you a board certified psychiatrist?

16  A.  Yes.

17  Q.  Could you tell the jurors what that means?

18  A.  It means that you have had an accredited residency, that

19  you have worked for two years, that you take a written exam and

20  you pass an oral exam, which is very scary because you have to

21  know -- you have to know what you are expected to know and if

22  you don't, it is very embarrassing.

23  Q.  And have you been an examiner on the American Board of

24  Psychiatry?

25  A.  Yes, I finally got to the other side.

1   Q.  So what does that mean?

2   A.  It means I am the scary guy, instead of the one who is

3   trembling.

4   Q.  So you are the examiner?

5   A.  Yes.

6   Q.  Now, during the course of your career, is it fair to say

7   you have received many, many awards?

8   A.  Not many, but a few.

9   Q.  I only want to talk about three of them.  I want to ask

10  you, in 1998 did you receive the golden award for the Academy

11  on Traumatology?

12  A.  Yes, and that's another professional organization of peers

13  who decided I should get their annual award.

14  Q.  And what is the Academy on Traumatology?

15  A.  Well, it's a smaller and different group but it's related

16  to that Society for Traumatic Stress Studies.

17  Q.  And in 2001, did you receive the Shafer award from the

18  National Organization for Victim Assistance?

19  A.  That's the other large nonprofit national organization that

20  advocates for victims and so I received their annual award.

21  Q.  And I know you mentioned it already, but in 2003 were you

22  also given the lifetime achievement award from the

23  Internationality Society for Traumatic Stress Studies?

24  A.  Yes.  And that's the most meaningful one to me.  That's the

25  recognition by peers of a lifetime of accomplishment in the

1    field.

2    Q.   Dr. Ochberg, over the course of your career have you

3    written on the subjects of the trauma and victimization and

4    Stockholm syndrome?

5    A.   Yes, I have.  I have edited books, I have written chapters,

6    I have written articles.

7    Q.   And have some of those articles been peer-reviewed?

8    A.   Yes.

9    Q.   Could you talk to the jurors about what peer reviewed

10   means?

11   A.   Well, in the science fields, if you write something and you

12   are writing about new findings, there are journals that are

13   called "peer-reviewed journals" and that mean that the article

14   is very carefully reviewed to be sure it's accurate, that it is

15   citing all the relevant research.  People are chosen to review

16   those articles who are known, themselves, as accomplished in

17   the field.  So peer review means it's been reviewed by your

18   peers.  And I have published peer-reviewed articles, as well as

19   opinion pieces that are not peer-reviewed.

20   Q.   What is an editorial board?

21   A.   Those are the group of peers who are assigned to review

22   these articles.

23   Q.   And have you also served on several editorial boards?

24   A.   Yes, I have.

25   Q.   In particular, were you on the editorial board for the

1   psychological stress series?

2   A.   Yes.

3   Q.   And the Journal of Family Psychotherapy?

4   A.   Yes.

5   Q.   And also the Journal of Traumatic Stress?

6   A.   Yes.

7   Q.   Could you talk about that last one for a moment?

8   A.   The Journal of Traumatic Stress is the journal associated

9   with the International Society for Traumatic Stress Studies.

10   It's a -- it's about this thick, comes out once a month.  Now,

11   it is mainly electronic.  And it's articles about treatment,

12   about research, if it has anything to do with the science of

13   trauma, and understanding now -- now, a lot of it is brain

14   science with MRIs and fancy brain imaging and looking at parts

15   of the brain that are involved when a person comes back from

16   combat, when they have flashbacks, when they are emotionally

17   numb, the kind of symptoms that go along with being exposed to

18   trauma.

19   Q.   Dr. Ochberg, have you ever testified in federal court as an

20   expert witness?

21   A.   Yes.

22   Q.   And have you testified in state court as an expert witness?

23   A.   Yes.

24   Q.   In the fields of trauma and traumatology and victimization?

25   A.   Yes.

1   Q.  And Stockholm syndrome?

2   A.  Yes.

3   Q.  About how many times have you testified as an expert?

4   A.  Well, it's between 50 and a 100.  Many of the times I

5   testified, though, were as mental health director in Michigan.

6   Whenever the department would be sued or involved in a case, I

7   would have to be in court.  I would say now I average once or

8   twice a year.

9   Q.  Can you give the jurors, maybe, an example of one of the

10   more famous cases you have been recently been involved with?

11   A.  Well, the last one was that case in Cleveland, Ohio, when

12   Ariel Castro held three young women in his home for ten years

13   and eventually they escaped.  And he was sent to prison and he

14   died in prison.  I was the government's expert witness at the

15   sentencing hearing for Ariel Castro.

16   Q.  Have you ever testified on behalf of a criminal defendant

17   or have you only ever testified for the government?

18   A.  No, I have testified on behalf of criminal defendants.

19   Q.  And have you ever failed to qualify as an expert?

20   A.  No.

21        MR. ALTMAN:  Your Honor, at this time we would move to

22   qualify Dr. Ochberg in the fields of trauma bonding and

23   battered woman syndrome and the Stockholm syndrome.

24        THE COURT:  You may proceed.

25

1                       DIRECT EXAMINATION

2    BY MR. ALTMAN:

3    Q.   Doctor Ochberg, I know you have talked about it a little

4    bit, but could you talk in more in detail about the trauma bond

5    and what it is?

6    A.   I started recognizing this as Stockholm syndrome, so let me

7    start there.  Here are perfectly normal, average people like us

8    and suddenly out of the blue, you are captured, might be in a

9    bank, might be in an airport.  And I end up interviewing those

10   people after they are safe.  And what they told me was, I knew

11   I was going to die.  They didn't say I thought I was going to

12   die.  They said, I knew I was going to die.  They were

13   terrified.  And they weren't allowed to talk, to move, to eat,

14   to use a toilet without permission.  Everything had to be

15   approved by the person or the persons who were holding them.

16        And then these little gifts of life were granted.  Oh,

17   yeah, you could use, pardon my K.L.        a pot to piss in

18   because that's what I was told.  And after that, not all of

19   them but some of them would tell me, you know, I had to fight a

20   certain feeling of compassion.  In his Italian accent, the

21   senior magistrate of Rome tells me, He was like my teenage son

22   and he developed a feeling of fatherly affection.  This was the

23   person who threatened to kill him, held him hostage, didn't let

24   him eat or move.

25        And this positive feeling, this -- in case Stockholm

1    syndrome, this trauma bond, where is it coming from?  What is

2    it?  My logic is when we are infants we have to feel very, very

3    positively toward our mother.  We are helpless.  We can't do

4    anything.  Somebody gives us not just birth but the gift of

5    life in the first several years.  We don't know for sure what

6    it feels like but I assume it's a form of a gratitude feeling.

7    Grateful to be alive.

8         And as we grow up, that feeling alters, depending on who we

9    are with.  It could be a friendship, it could be a romantic

10   attachment, it could be a brotherly/sisterly feeling.  It is a

11   special feeling.  But in the case of trauma, it was generated

12   by somebody who could have killed you and you felt terrible

13   fear and then they didn't kill you.  They gave you the gift of

14   life.

15        Now, a battered woman is not a same thing as someone who is

16   held hostage.  She went into that relationship at some point

17   because she chose to, she's in it and then when she is

18   pregnant, she is kicked in the stomach and she doesn't leave.

19   Now, sometimes she is not leaving because she has no place to

20   go.  But when the person describes to me, the psychiatrist

21   listening to her, that, yes, I felt a loving feeling, I don't

22   know where it came from, or I don't know why it stayed and I --

23   and it's hard for me to explain why I didn't leave.

24        Those girls in Cleveland could have left at various times.

25   Even though they were shackled, they were not shackled all the

1   time.  Why did they stay?  That's part of what I was testifying

2   about.  There was a trauma bond, a very strong bond and it was

3   very hard to think about leaving until things lined up.

4       Trauma bond doesn't stay forever.  There comes a time when

5   the balance shifts and you're free or you are free enough, or

6   you have enough courage or enough other thoughts and the bond

7   is no longer there.

8       But I can tell you this, my field didn't know about this

9   until a few decades ago.  I am not sure everybody in America

10  understands this.  But we need to understand it because a lot

11  of us are living in conditions in which we are dominated, we

12  don't want to be there and we feel this unusual attachment to

13  the person who doesn't kill us and we stay.

14  Q.  Now, in your experience, would it be surprising to you if

15  the victim of trauma bonding did not go ahead and call the

16  police even if given the opportunity to do so?

17  A.  No.  In fact, back when I was spending that time with the

18  FBI in the mid-70s, one of the older agents said, I remember a

19  kidnapping case, we caught the kidnapper and the kidnapped

20  victim is clinging to him and resisting us.

21      So, yes, you see over and over that the trauma bond, at

22  times, makes the person feel closer to the perpetrator, to the

23  one who is harming them, than they do to the police or to

24  someone like me on the outside, a doctor who wants to help

25  them.  They don't trust us.  They are bound emotionally.  They

1    are attached to the person who could kill them but doesn't.

2    Q.  And you just mentioned something that I wanted to touch on.

3    Over the course of your thousands of interactions with women

4    who have been battered, for example, have you come across women

5    whose abuser uses the fact that the woman had been sexually

6    molested as a child against her; have you come across that?

7    A.   I'm not sure that I have seen that explicitly and blatantly

8    before.  But I have certainly seen many woman who were abused

9    as children and then who end up being abused and raped as

10   adults; as though there is something missing in their antenna

11   and their ability to make judgments of who to really trust.

12   And if they have been raised by wolves, they trust a wolf.

13   Q.  Would it be surprising to you, Dr. Ochberg, if the victim

14   of trauma bonding or battered woman syndrome, didn't tell her

15   family that she was being abused, even if she was on the phone

16   with her family?

17   A.  It doesn't surprise me.

18   Q.  Would it be surprising to you if the victim of trauma

19   bonding did not run away, as you just mentioned, even if the

20   person wasn't shackled or tied to a post?

21   A.  No.  It wouldn't surprise me.  And that's the definition of

22   the bond.  That's why that concept is out there because so

23   often they don't run away.

24   Q.   In fact, would it be surprising to you, and I know you

25   mentioned that you had treated women who have been coerced into

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1   prostitution, would it be surprising to you if the victim of

2   trauma bonding and battered woman syndrome started working for

3   the abuser to make him money, as a prostitute, for example?

4   A.   It wouldn't surprise me.

5   Q.   And have you seen that before?

6   A.   Yes.

7   Q.   Is that common or rare?

8   A.   I don't know.   I don't know how common or rare it is.   I

9   just -- I have seen it so it doesn't surprise me.

10  Q.   Now, could you talk a little bit about how, as a

11  psychiatrist, you have seen people finally be able to overcome

12  the trauma bond that you have been describing?

13  A.   Well, if I'm the chosen psychiatrist, somebody wants to see

14  me, I have an advantage to begin with.   They are coming of

15  their own will.   They are paying.   They know and they expect

16  that something helpful will happen.   But they still are often

17  shy, nervous, first time, maybe first few times.

18      We are going to be talking about things that are very

19  intimate.   And while maybe it shouldn't be embarrassing to be a

20  victim of crime, every crime victim I have known has felt

21  embarrassed, sometimes angry but also embarrassed, as though it

22  happened to me because there was something wrong with me or I

23  should have -- I should have known better.   I should have

24  prevented it.   They have a lot of anger at themselves.

25      And my first job is to make this into a safe place where we

1    can talk about it and where that person can have a -- they

2    often tell me, Thank goodness you get it, because their

3    experience is talking to others that they don't get it.  And if

4    somebody gets it, that's the beginning of finding your own way

5    out from having been a victim, from having been bound

6    emotionally to your victimizer and then from having the

7    confidence in yourself to believe that you are going to have a

8    free life, a safe life.

9    Q.  And, Dr. Ochberg, is it fair to say -- where have you been

10   these last four days?

11   A.  Oh, I have been in court sitting right there.

12   Q.  So you have watched this whole trial; is that fair to say?

13   A.  Yes.  Yes.

14   Q.  And during the course of your career, could you talk about

15   how women -- and we will talk about women for a moment -- women

16   who have been abused in the past and were in battered women

17   situations but didn't leave, looking at it, talking to you, how

18   they looked back on it and how they feel about it?

19   A.  Well, as I said, looking back on it, it's often with a

20   expression of being sadder and wiser.  It's a hard lesson to

21   learn but they look back with embarrassment, sometimes with

22   shame, certainly with regret.  But my patients, for the most

23   part, realize that was them.  They don't say, oh, it wasn't me.

24   They know where they have been and they know where they are

25   now.

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1   Q.   Did you hear K.▮ L.▮ testify that looking back she

2   feels as though she was brainwashed?

3   A.   Yes, I heard the word "brainwashed."  I wouldn't use that

4   word because to me brainwash means it's very deliberate and

5   it's done mechanically, sometimes with hooding and with torture

6   that's applied in a military situation.  But something close to

7   Stockholm syndrome, which most people don't know and can't put

8   into words, absolutely.  I think I knew what she was talking

9   about and it made sense to me.

10  Q.   And what she was talking about and the way she was

11  describing her brainwashing, was that consistent or

12  inconsistent with what you have seen in victims of battered

13  women situations?

14  A.   Again, I would rather not use the word brainwashing but if

15  we say trauma bond or was it like Stockholm syndrome?  Yes,

16  yes, it -- to me it looks like that's what she was experiencing

17  and describing.

18  Q.   And did you hear T.C.▮ M.▮ this morning, testify that

19  in looking back at her time with the defendant that the mixture

20  of violence with gift giving, that it was confusing to look

21  back at.  Did you hear her testify about that?

22  A.   Yes.

23  Q.   And is that confusion consistent or inconsistent with what

24  you have seen in treating thousands of women in similar

25  situations?

1    A.  It's consistent.  It's consistent to feel confused because

2    until you grow out of this, and even when you do, it's hard to

3    acknowledge that you went through a time in your life of being

4    emotionally bonded to somebody who raped you, who battered you,

5    who denied your -- your freedom and your dignity.

6    Q.  And could you talk a little bit about how time away from

7    your abuser -- and I know you talked about this a little bit,

8    but how the length of time that you are away from your abuser

9    will affect your ability to gain perspective on what you are

10   undergoing?

11   A.  There is no time course.  Everybody is different.  But time

12   away from an abuser is time to heal.  What matters so much is

13   that this healing time is safe, is compassionate and is

14   informed with the science that we have developed over the last

15   30 years.

16        There is a lot in the newspapers, now, about an American

17   POW coming home and spending time, first, overseas and then on

18   an army base here before meeting with his family, as a

19   controversial case.  But still you can see that it takes time

20   to go from being captured, whether it is literally captured or

21   emotional captured, to being free.

22   Q.  And you talked a lot about the violence that is used

23   against women in some of these scenarios and you talked a lot

24   about how some people respond differently, right?  Is it fair

25   to say that some people might respond differently to being a

1    battered woman than other people would?

2    A.   Oh, definitely.

3    Q.   So did you hear, for example, that T.J. M. was with

4    the defendant from when she was 18 until she was about 20 or 21

5    years old?

6    A.   Yes.

7    Q.   And that K. L. was with him for about 10 months?

8    A.   Yes.

9    Q.   And that T.C. M. was with him about five months?

10   A.   Yes.

11   Q.   But that C. S. ran away after three days; did you

12   hear all that?

13   A.   Yes.

14   Q.   And is that -- that sort of differentiation consistent or

15   inconsistent with your interactions with thousands of battered

16   women?

17   A.   Battered women is a large population, unfortunately.

18   Battered woman syndrome, staying and staying for a long period

19   of time is a fraction.  So there is a spectrum and some get

20   away sooner and some don't.

21   Q.   And you talked about, with respect to the Stockholm

22   syndrome, the threat followed close thereafter by a gift of

23   some kind.  Did you hear the victims talk about gift giving in

24   this case?

25   A.   Yes.

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1   Q.  In particular, did you see the videos -- I think it's

2   Government's Exhibit 77 and 78, video of K.L. in the Gold

3   Coast with the defendant where she appeared to look happy?

4   A.  Yes.

5   Q.  And a video of K.L. and L.S. in Dubai with the defendant,

6   where the defendant was giving them gifts, where they appeared

7   to look happy?

8   A.  Yes.

9   Q.  And did you see a few videos of K.L. and T.C.M in Dallas

10  with the defendant where they appear to look grateful and

11  happy?

12  A.  Yes.

13  Q.  And an E-mail, I think it's Government's Exhibit 74, that

14  K.L. sent the defendant from Australia where she said that she

15  still loved him and that she missed him.  Did you hear that?

16  A.  Yes.

17  Q.  Is any of that consistent or inconsistent with what you

18  have seen from battered women, throughout the course of your

19  career, who suffer the trauma bond?

20  A.  It's consistent.

21  Q.  And could you talk about why?

22  A.  Well, I think we heard one person say, I was happy and

23  another one say, I looked happy but I wasn't really happy.  And

24  I think that's part of the variety, part of the spectrum.

25  People who are in long-term, abusive relationships where the

1    abuse can be sudden and severe and where the opposite, the love

2    making, the apology, the gift giving, can evoke very positive

3    feelings that can be part of the pattern.

4        Now, in some cases and I think I heard here it wasn't so

5    much -- she said, It wasn't so much that I felt happy, it was

6    that I felt that in this phase he wouldn't hurt me, so I felt

7    more safe.  Now, feeling safe after you've felt terrified can

8    feel relatively happy.

9    Q.  And did you hear situations where the women testified that

10   the defendant used violence against them and then shortly

11   thereafter had them go on prostitution dates?

12   A.  Yes.

13   Q.  Like when ███ ███ testified that she was anally raped

14   and then forced to go see a client?

15   A.  Yes.

16   Q.  And where ███ ███ testified that she was strangled and

17   that she was threatened with a hot knife and then forced to see

18   a prostitution client?

19   A.  Yes.

20   Q.  But did you also hear about times where the violence seemed

21   relatively unconnected to prostitution?

22   A.  Yes.

23   Q.  Like where ███ woke up one morning to being strangled by

24   the defendant?

25   A.  Yes.

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1   Q.   Or when J.R. -- sorry, when T.C.M. and K.L. would say the

2   defendant would hit them for not cleaning the house or making

3   breakfast?

4   A.   Yes.

5   Q.   Could you talk about how the effects of this seemingly

6   random kind of abuse would affect a person's compliance with

7   the abuser's subsequent instructions?

8   A.   Well, from other psychological research with humans and

9   with animals, there is something called intermittent

10  reinforcement.  And a behavior that we as humans have, if it's

11  reinforced, meaning we get a reward, or something called a

12  negative reenforcement, we got a punishment, shock, that

13  behavior -- the shock would be for not doing the expected

14  behavior.  If the shocks are intermittent and unexpected, the

15  behavior lasts longer.

16      So that's the result of years and years of psychological

17  investigation.  And I think it applies here that if you're

18  punished by a violent outburst and it appears irrational and it

19  comes out of the blue and you don't know when it is going to

20  be, you are all the more likely to sustain your trauma bond.

21  Q.   Longer?

22  A.   Longer.

23  Q.   Now, have you seen evidence that the victims, as you have

24  testified already, they did not all run away right away?

25  A.   Oh, yes.

1    Q.   Does that change your opinion at all?

2    A.   No, that's what my opinion is all about.  It's all about

3    not running away when we, who aren't in that circumstance say,

4    of course, I would run away.  How do you explain the fact that

5    a person doesn't run away?  And that's where the investigation

6    of Stockholm syndrome, trauma bond informs us.

7    Q.   And during the course of what you have observed in this

8    trial, is what you have observed from the women consistent or

9    inconsistent with people who have suffered the trauma bond?

10   A.   Consistent.

11   Q.   And does the fact that in the videos, at times, they looked

12   happy change that opinion in any way?

13   A.   No.

14   Q.   And does the fact that K.L. wrote that E-mail from

15   Australia change that opinion in any way?

16   A.   No.

17   Q.   Now, in fairness you haven't sat through the testimony of

18   J. R. correct?

19   A.   Correct.  But I did review reports that the government

20   supplied me and they included photographs, film, investigative

21   reports, her on-the-record statements.  So I didn't see her in

22   court but -- but I read a lot about her.

23   Q.   And could you tell the jurors why you are not going to be

24   here tomorrow to see her testimony?

25   A.   I have appointments and I know that her testimony is going

1    to take some time, so the way to assure that I could be here

2    with you is to do it today.

3    Q.   And so -- but have you reviewed all of her previously

4    statements to law enforcement?

5    A.   Yes.

6    Q.   And her text messages from her phone?

7    A.   Yes.

8    Q.   Many of whom -- many of which were with the defendant?

9    A.   Yes.

10   Q.   And does your opinion about what you have seen in her

11   statements and in her interactions with the defendant, is that

12   consistent or inconsistent with what you have seen thousands of

13   times in the trauma bond?

14   A.   Consistent.

15   Q.   And have you seen evidence that, at times, the women in

16   this case assisted the defendant by creating spreadsheets for

17   him, booking flights for him, making hundreds of thousands of

18   dollars for him; have you seen that?

19   A.   Yes.

20   Q.   And could you tell the juries -- the jurors whether that is

21   consistent or inconsistent with what you have seen out of

22   trauma victims and battered women?

23   A.   Well, it's consistent that the bond creates an alliance and

24   sometimes a fantasy that things will be better, that some day

25   this will stop.  Takes a while to sometimes realize that it

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1    won't get better but what I -- what I saw was partnership.

2    Q.  Does the fact that the women may have looked happy in some

3    of the videos mean that they were happy all of the time?

4    A.  No.

5    Q.  Does the fact that the women may have looked happy in some

6    of the videos or pictures or in an E-mail mean that the

7    defendant never raped any of them?

8    A.  No.

9    Q.  Does it mean that the defendant never beat any of them?

10   A.  No.

11   Q.  Does it mean that the defendant never threatened them or

12   their families with death or with harm?

13   A.  No.

14           MR. ALTMAN:  I have no further questions, Your Honor.

15           Thank you, Dr. Ochberg.

16           THE WITNESS:  Thank you, counselor.

17           THE COURT:  Ladies and gentlemen, we will take a

18   10-minute recess.  Please don't discuss the case.

19           COURT SECURITY OFFICER:  All rise.

20      (The jury exited the courtroom at 3:39 p.m.)

21      (A recess was taken from 3:38 p.m. to 3:59 p.m.)

22           COURT SECURITY OFFICER:  All rise.

23      (The jury entered the courtroom at 3:59 p.m.)

24           THE COURT:  Everyone, please be seated.

25           Mr. Rowe?

```
1                        CROSS-EXAMINATION
2    BY MR. ROWE:
3    Q.   Dr. Ochberg, good afternoon.
4    A.   Good afternoon, Mr. Rowe.
5    Q.   Dr. Ochberg, what is your hourly rate?
6    A.   Could you repeat that?
7    Q.   What is your hourly rate?  Your professional hourly rate?
8    A.   It's $150 an hour for patients, it's $600 an hour for
9    expert work.
10   Q.   So you are being paid 600 U.S. dollars an hour for this?
11   A.   Yes.
12   Q.   And do you -- how do you calculate it; portal to portal or
13   on an hourly basis?
14   A.   Usually, portal to portal.
15   Q.   So were -- were you based?
16   A.   Michigan.
17   Q.   So you basically get $600 for every hour from your trip
18   from Michigan to Florida and back from Florida to Michigan?
19   A.   If you want to know what the government pays, it's
20   35,000 -- it's capped at $35,000 for the time on the case.
21   Q.   Okay.  So you are being paid $35,000.
22   A.   Yes.
23   Q.   For your -- for your -- thank you very much.  Okay.
24        Now, prior to -- and that's just for the testimony because
25   you did not -- you did not see the young ladies outside of the
```

1  courtroom?

2  A.  Correct.

3  Q.  So the first time you saw them was today?

4  A.  Yes, other than through material provided.

5  Q.  Yes, I know you received material from --

6  A.  Yes.

7  Q.  Okay.  Now, are you familiar with Dr. Joseph Carver?

8  A.  Dr. Joseph Carver?

9  Q.  Yes?

10  A.  I don't know the -- I don't know the man.

11  Q.  You don't know the name?  Are you familiar with an article

12  that he wrote called, Love and the Sickness, Stockholm

13  Syndrome?

14  A.  I'm not sure that I have read that article.

15  Q.  The -- in that article --

16         MR. ALTMAN:  Objection, Your Honor, hearsay.

17         THE COURT:  Could I have counsel approach?

18     (Sidebar outside the presence of the jury:)

19         THE COURT:  We know an expert can rely on hearsay but

20  is your question going to be reading from the article and

21  asking him questions or?

22         MR. ROWE:  No, I am just going to ask him if the

23  article sets forth four criteria.  I am going to ask him about

24  the four criteria.

25         THE COURT:  The what?

 1            MR. ROWE:  I am going to ask him about the four

 2    criteria as being Stockholm syndrome.  He can agree or

 3    disagree.

 4            THE COURT:  All right.

 5        (Sidebar concluded and the following occurred:)

 6    BY MR. ROWE:

 7    Q.  Yes.  Dr. Carver reflects four criteria in his analysis of

 8    the -- of the -- on the Stockholm syndrome.  He says that in

 9    these situations it has to be perceived, it has to be the

10    presence of a perceived threat, there has -- there normally is

11    perceived small kindness from the abuser to the victim and then

12    he says there is isolation from perspectives other than from --

13    isolation from perspectives other than the abuser to the

14    victim, so the victim is isolated.  And he says that there is

15    an inability to escape the situation and the four basic

16    criteria that he sees establishing Stockholm syndrome between

17    these abuse-love relationships.

18        Would you agree with those four criteria?

19    A.  I agree for Stockholm syndrome but reserving trauma bond as

20    a broader concept than Stockholm syndrome.

21    Q.  But you did testify about the Stockholm syndrome, it being

22    a factor in trauma bonding?

23    A.  Mr. Rowe, Stockholm syndrome is a particular narrowly

24    defined circumstance in which a trauma bond occurs.  There are

25    other situations that are similar to but different from

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1    Stockholm syndrome in which a trauma bond occurs.

2    Q.   I see.  So you can have a trauma bond without the Stockholm

3    syndrome?

4    A.   Correct.

5    Q.   But the Stockholm syndrome is part of -- would be a

6    category of the trauma bond?

7    A.   Yes.

8    Q.   Okay.  Now, the relationships that you are testifying about

9    or have testified about, relate to controlling and abusive

10   relationships?

11   A.   Yes.

12   Q.   And you would agree that the Stockholm syndrome generally

13   developed out of hostage situations?

14   A.   Yes.

15   Q.   And you would agree that this case that we have here, there

16   are no hostage situations?

17   A.   Yes.  Although, counselor, there may have been times when

18   something very much like a hostage situation was perceived by

19   one of -- or more of the women; a period of time in which she

20   felt unable to leave and some of those Stockholm elements would

21   be appropriate.

22   Q.   But the women from Australia, for instance, who were

23   basically -- basically, would leave and go to either brothels

24   or to outcalls or to -- or to what we call dancing clubs at

25   night, those women could not be hostages?

1   A.   Correct.  Not at that time.

2   Q.   And the lady who was in Jamaica for three weeks with the

3   defendant, was not a hostage?

4   A.   Correct.

5   Q.   And the ladies that we saw in the, you know, doing the

6   birthday party, I don't need to play the video again where you

7   said that was at -- in Dubai when they were having the party at

8   Christmas, those women were not hostages?

9   A.   Correct, they were not hostages in that circumstance.

10  Q.   So, classically, the Stockholm syndrome is a hostage and

11  developed and used extensively in -- now of Al-Qaida; isn't

12  that correct?  Al-Qaida techniques when Americans are taken --

13  are taken into military captivity?

14  A.   I would like you to repeat the question, there was a phrase

15  I did not catch.

16  Q.   Wasn't the Stockholm syndrome developed extensively and

17  used extensively to analyze the conduct of Americans who were

18  in Al-Qaida captivity?

19  A.   No, no, no, no, because I am the one who is credited with

20  defining it and I defined it in the 1970s before Al-Qaida

21  captivity occurred.

22  Q.   But was it applied to Al-Qaida activity?

23  A.   At the time of the development of the concept, there were

24  other terrorist organizations like the PFLP, the Red Brigades,

25  the Japanese Red Army, but there was no Al-Qaida at that time.

1  Q.  Those are -- again, those are terrorist organizations?

2  A.  Yes.

3  Q.  This is not a case involving terrorists?

4  A.  No.

5  Q.  In fact, you would agree that in many of the cases, what

6  you had was, essentially, sharing of profits from a business?

7  A.  I'm going to need you to repeat.

8  Q.  Sharing of profits from a prostitution business?

9  A.  What are you asking that I agree with?

10 Q.  I am asking if you would agree that the facts would support

11 the sharing of profits for a prostitution business?

12 A.  That that's what was going on in this case?

13 Q.  Yes.

14 A.  No.

15 Q.  They are not sharing of profits?

16 A.  I didn't see sharing of profits.  I saw profits accruing to

17 one person with a illusion that there would be something in the

18 future.  I didn't see profit sharing.

19 Q.  So when the -- when the girls received all of their -- all

20 of their expenses paid, wouldn't you say that the profits of

21 the business were being used to pay their profits?

22 A.  No.

23 Q.  Pay their expenses?

24 A.  No, I wouldn't say so.

25 Q.  We could agree to disagree on that point.

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1              MR. ALTMAN:  Your Honor, objection to the commentary

2     and move to strike.  That is not at all what Dr. Ochberg said.

3              THE COURT:  The commentary is stricken.

4     BY MR. ROWE:

5     Q.  The -- you referred several times in your testimony to

6     kidnapping.  There was no kidnapping in this case?

7     A.  Well, I would have to defer to a lawyer as to whether the

8     statute of kidnapping ever applied in this case.  It is not my

9     area of expertise.

10    Q.  There was no discussion of kidnapping as far as you have

11    been here?

12    A.  I don't know if kidnapping is a charge.

13    Q.  I am asking if you heard any discussion of kidnapping?

14    Have you heard there has been a kidnapping in this case?

15    A.  The term "kidnapping" has not been used in this case.

16    Q.  Okay.  Now, how is posttraumatic stress distress (sic), how

17    is it diagnosed?

18    A.  Posttraumatic stress disorder is diagnosed by a clinical

19    interview, and the finding of a traumatic event that passes a

20    certain defined threshold, and the existence of three major

21    categories of symptoms.  The first has to do with traumatic

22    memories, memories that come sometimes as nightmares, sometimes

23    as flashbacks, sometimes as body sensations that are evoked by

24    reminders of the traumatic event; and then by numbing of

25    certain emotions and avoidance of reminders; and then by

1    heightened anxiety or awareness or vigilance that can result in

2    insomnia and concentration problems and difficulty controlling

3    one's temper and an exaggerated startle response.

4    Q.  Now, would you agree that in this particular case, there

5    have been no diagnosed criteria of posttraumatic stress

6    disorder with any of these girls?

7    A.  I cannot comment on that because I did not and was not

8    retained to determine that and to examine the survivors of the

9    alleged rape and battering and systematic denigration using

10   images from the past.

11   Q.  I mean, you are not aware of any?

12   A.  I am not aware of the elements of posttraumatic stress

13   disorder.

14   Q.  Have you written any scholarly articles concerning the

15   application of posttraumatic stress disorder to commercial sex

16   relationships?

17   A.  No.

18   Q.  In your view, does the fact that some of these incidents

19   occurred in a legal environment in which commercial sex is

20   permissible, has it changed the application of the

21   posttraumatic stress disorder?

22   A.  Mr. Rowe, whether or not posttraumatic stress disorder

23   exists is a different issue.  If the question has to do with

24   the trauma bond, then I would say, no, I don't see that it

25   makes a difference whether the sex activity was legal or not.

1  Q.  Would the trauma bond occur in every girl in the same way?

2  A.  No, not in -- no, it wouldn't occur in every girl in the

3  same way.

4  Q.  Depending on the personality and the metabolism of the

5  young lady, it would be different?

6  A.  Well, depending on many factors including those.

7  Q.  Did you prepare any written report concerning this case?

8  A.  No.

9  Q.  Is this your first trip to Florida?

10  A.  No.

11  Q.  You used the expression "to trust a wolf."  What did you

12  mean by that?

13  A.  Oh, I used the metaphor of being raised by wolves.  Some

14  people, unfortunately, are born into and are raised by abusive

15  parents and are subjected to sexual and physical abuse in

16  childhood.  And I was meaning that if you are raised that way,

17  it can impair your ability to know how to trust a trustworthy

18  person and you may find yourself more often in the presence of

19  predators.

20  Q.  Moral predators, you mean?

21  A.  Predators, human predators, using the term "predator" to

22  mean some person who exploits and traumatizes another person.

23  Q.  Now, you did a case for the federal government in which you

24  testified about a man who kept some woman in a house for a long

25  period of time?

June 19, 2014

U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1    A.   That was not a federal case, it was a -- it was a county,

2    Cuyahoga County in the state of Ohio; so the case was a local

3    jurisdiction not federal.

4    Q.   That case was dramatically different from this case?

5    A.   That case is different from this case in many aspects.   The

6    commonality is about a reluctance to escape because of a

7    certain amount of bond.

8    Q.   Or alleged?

9            MR. ROWE:  No further questions, Your Honor.

10           MR. ALTMAN:  I'm sorry, I did not hear the last

11   question.  Oh, I'm sorry.

12                     REDIRECT EXAMINATION

13   BY MR. ALTMAN:

14   Q.   Dr. Ochberg, you were asked about your retainer fee?

15   A.   Yes.

16   Q.   When you go to testify for the government -- well, let me

17   ask you, do you have patients?

18   A.   Yes.

19   Q.   Do you see patients almost every day?

20   A.   Yes.

21   Q.   Multiple patients a day?

22   A.   Yes.

23   Q.   And do they pay you lots of money?

24   A.   Not lots but they pay.

25   Q.   And so -- and -- more than I get paid probably, Doctor,

1  right?  And when you come to Miami to a place like this, do you

2  have to cancel all of those appointments?

3  A.   Yes.

4  Q.   And so you are not making that money?

5  A.   Yes.

6  Q.   And are you also retained for speaking engagements?

7  A.   Yes.

8  Q.   In fact, you are going to one all week next week, right?

9  A.   Yes.

10 Q.   All over the country?

11 A.   Yes.

12 Q.   All over the world?

13 A.   Yes.

14 Q.   And you get paid for all of those?

15 A.   Yes.

16 Q.   Should I ask you whether it's lots of money?  Sometimes,

17 fair to say?

18 A.   Sometimes it's good pay and, actually, often I'm -- I'm not

19 paid; I'm doing pro bono work.

20 Q.   But did you have, in fact, speaking engagements that you

21 canceled in order to be here in front of this jury this week?

22 A.   Yes.

23 Q.   And so is it all profit for you to come and testify?

24 A.   No.

25 Q.   And can I ask you, Dr. Ochberg, how many years have you

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

```
1    been a practicing psychiatrist?

2    A.   40.

3    Q.   And you teach at Michigan State University?

4    A.   Yes.

5    Q.   You were a cabinet-level secretary, the director of mental

6    health in Michigan, right?

7    A.   Yes.

8    Q.   You are on the board of just about every committee and task

9    force that's relevant in psychiatry in this country at some

10   point or another?

11   A.   Well, relevant to my specialty.

12   Q.   And you were also the associate director for the National

13   Institute of Public Mental Health?

14   A.   Yes.

15   Q.   Can your testimony be bought?

16   A.   No.

17   Q.   Could you tell this jury whether or not because of those

18   $35,000, you would have come here and said that trauma bond

19   existed when, in fact, it did not?

20   A.   I wouldn't.

21   Q.   Would you come here and talk to this jury about Stockholm

22   syndrome if you thought it didn't exist just because of what

23   the government was paying you?

24   A.   No.

25   Q.   What's your reputation worth over the course of your
```

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1   career, Dr. Ochberg?

2   A.   It's who I am and it is worth a lot.

3   Q.   Why did you come to testify and say the things that you

4   have to this jury?

5   A.   Because I believe they are true.

6   Q.   Now, you were asked about whether or not the trauma bond --

7   well, whether or not women were held hostage in this case; do

8   you remember that?

9   A.   Yes.

10  Q.   And you said, Not hostages at that time when you were asked

11  about sometimes that they went outside of the house; do you

12  remember that?

13  A.   Yes.

14  Q.   Why did you say "at that time"?

15  A.   Well, because I believed in the course of this

16  relationship, there were times when there really was no escape.

17  I think that, in general, there was a lot more freedom to leave

18  and the failure to leave was this trauma bond, this emotional

19  bond.  But I think there also were times when it was impossible

20  to leave.

21  Q.   And, for example, when ███ T.J. ███  ███ M. ███ described being anally

22  raped on a chair in an abandoned golf course; do you remember

23  that?

24  A.   Yes.

25  Q.   Was she free to leave at that point?

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

```
 1    A.   I don't believe so.

 2    Q.   Now, you talked a lot about how, in a Stockholm syndrome

 3    scenario or a trauma bond scenario, somebody might be held

 4    captive for a moment but that trauma bond can last long after

 5    that; is that fair to say?

 6    A.   Yes.

 7    Q.   And so you testified that at some point these women were

 8    captive in a very real way, correct; according to their

 9    testimony?

10    A.   I don't know that I testified to that.  I implied that and

11    I would testify that there were times when, as counsel just

12    mentioned, when there was no escape.

13    Q.   And how would that affect the trauma bond in people that

14    you have seen who have suffered the trauma bond?

15    A.   I think it's all the trauma bond.  And in some

16    circumstances it's a trauma bond in literal captivity with a

17    locked door, and at other times it's a trauma bond because

18    you're feeling that you are with a safe person and you are not.

19    Q.   Now, you were asked about whether the term "kidnapping" had

20    been used in this case; do you remember that?

21    A.   Yes.

22    Q.   Does the fact that the term "kidnapping" hasn't been used

23    in this case have anything to do with whether or not trauma

24    bonding existed in this case?

25    A.   No.
```

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1   Q.  Or whether the women suffered from battered woman syndrome

2   at any point in this case?

3   A.  No.

4   Q.  Now, you have talked about the effects of violence on a

5   woman, a battered woman, correct?

6   A.  Yes.

7   Q.  Could you talk a little bit about the psychological effects

8   of psychological abuse on a battered woman?

9   A.  Well, it not only can produce this bond but what breaks my

10  heart is it changes a person's opinion about herself, and she

11  can hold herself in far less esteem.  And part of what I find I

12  need to do as a doctor is help someone recover their self-love;

13  many other things, as well, but that's a big part of it.

14  Q.  What effect does that kind of humiliation, that kind of

15  degradation, have on the likelihood that the trauma bond will

16  exist and continue?

17  A.  The bond occurs with unequal status and unequal power, so

18  when you diminish someone else's status, dignity, power, your

19  control increases.

20  Q.  And in that respect, what is the significance in your mind

21  of, for example, the defendant's rules on the women.  Like, for

22  example, the rule that they call him "Daddy"?

23  A.  I think of it as similar to imposing slavery, that it's

24  diminishing the status.  You're a child, I'm your parent but

25  I'm your parent that has sex with you, I'm a dangerous parent

1   and I am a parent that doesn't care about your dignity.

2   Q.  And you testified that -- well, you were asked whether

3   there were factors that would make the bond different from

4   woman to woman; do you remember that?

5   A.  Yes.

6   Q.  What are some of the factors that might differentiate the

7   bond from woman to woman?

8   A.  The difference is in personality and options, in education.

9   But there are a lot of differences, too, that are sometimes

10  medical.

11      We look at why a soldier, the soldier has posttraumatic

12  stress when another soldier in the same place doesn't.  And it

13  isn't that one is stronger or weaker, the body has a lot of

14  varieties.  We are dealing with complicated issues and people's

15  temperament, character, biology, so some have a bond where

16  others wouldn't.  Some have a bond that lasts longer.  There is

17  a great deal of variety.

18  Q.  And you were asked a number of questions by Mr. Rowe about

19  whether or not the women were tied, whether they were held,

20  strapped to a post or whether or not they had the ability to go

21  to client's houses on their own; do you remember that?

22  A.  Yes.

23  Q.  Does the fact that the women did not run away even though

24  they were not tied up, does that fact mean that the defendant

25  never beat them?

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1    A.   No.

2    Q.   Does it mean that the defendant never raped them?

3    A.   No.

4    Q.   Does it mean that the defendant never threatened to kill

5    all of their family and them?

6    A.   No.

7    Q.   Does the fact that, for example, K.L. sent that E-mail

8    from Australia mean that the -- saying that she loved the

9    defendant and that she missed him, does that fact mean that the

10   defendant never beat her and never raped her and never

11   threatened her with death?

12   A.   No.

13   Q.   Could you talk about why that is?

14   A.   Well, I think the paradox, the possible dilemma is here we

15   have expressions of love, of caring, of commitment, of

16   obedience and does this mean that these individuals were not

17   subjected to the cruelties that Counselor Altman just

18   identified?  And it doesn't.  It doesn't mean that because a

19   person appeared or actually was happy at one moment, that she

20   wasn't treated in an inhumane and criminal way in another

21   moment.

22   Q.   And have you studied this in your patients?

23   A.   Yes.

24   Q.   And have you studied it in the patients of others?

25   A.   Yes.

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1   Q.  I have no further questions.  Thank you very much,

2   Dr. Ochberg.

3          THE COURT:  Doctor, thank you.  You have a good day.

4          THE WITNESS:  Thank you.

5          MR. ALTMAN:  Your Honor, we have moved very quickly

6   today and we have run out of witness for the day.

7          THE COURT:  The jury doesn't want to leave yet.  They

8   want to be here at least past 5 p.m., I'm sure.

9          All right.  Ladies and gentlemen, we will

10  unfortunately adjourn early today and tomorrow we begin at

11  9:30.  Please remember the start time is 9:30.

12         Have a good drive home and we will see you tomorrow.

13         COURT SECURITY OFFICER:  All rise.

14     (The jury exited the courtroom at 4:31 p.m.)

15         THE COURT:  All right.  We will see you tomorrow

16  morning.

17         MR. ALTMAN:  Thank you, Judge.

18     (The proceedings excerpt adjourned at 4:31 p.m.)

19

20

21

22

23

24

25

June 19, 2014
U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

1                    **C E R T I F I C A T E**

2

3        I hereby certify that the foregoing is an

4   accurate transcription of the proceedings in the

5   above-entitled matter.

6

7

8   _07/23/14__            STEPHANIE A. McCARN, RPR
         DATE               Official United States Court Reporter

9                          400 North Miami Avenue, Twelfth Floor
                           Miami, Florida 33128

10                          (305) 523-5518

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

June 19, 2014

U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

## $

**$150** [1] - 41:8
**$35,000** [3] - 41:20, 41:21, 52:18
**$600** [2] - 41:8, 41:17

## 0

**07/23/14** [1] - 59:7

## 1

**1** [1] - 1:7
**10** [1] - 34:7
**10-minute** [1] - 40:18
**100** [1] - 25:4
**110** [1] - 1:17
**12-2** [1] - 1:6
**13-20914-CR** [1] - 1:2
**1700** [1] - 1:17
**18** [1] - 34:4
**19** [1] - 1:4
**1961** [1] - 4:5
**1965** [1] - 4:11
**1966** [1] - 5:5
**1969** [1] - 5:5
**1970s** [1] - 45:20
**1972** [1] - 16:17
**1973** [1] - 10:5
**1979** [1] - 8:13
**1980** [1] - 18:2
**1981** [1] - 8:13
**1998** [1] - 22:10

## 2

**20** [1] - 34:4
**2001** [1] - 22:17
**2003** [2] - 18:13, 22:21
**2014** [1] - 1:4
**21** [1] - 34:4
**26** [2] - 2:5, 8:5
**2:37** [3] - 1:5, 3:1, 3:4

## 3

**3** [2] - 2:5, 2:17
**30** [2] - 19:3, 33:15
**305** [4] - 1:14, 1:18, 1:23, 59:10
**33128** [2] - 1:23, 59:9
**33131** [1] - 1:18
**33132** [1] - 1:13
**35,000** [1] - 41:20
**3:38** [1] - 40:21
**3:39** [1] - 40:20
**3:59** [2] - 40:21, 40:23

## 4

**4** [1] - 1:8
**40** [1] - 52:2
**400** [2] - 1:22, 59:9
**41** [1] - 2:5
**4:31** [3] - 1:5, 58:14, 58:18

## 5

**5** [1] - 58:8
**5,000** [1] - 8:10
**50** [2] - 2:5, 25:4
**523-5518** [2] - 1:23, 59:10
**59** [2] - 1:7, 2:18

## 6

**600** [1] - 41:10
**600-page** [1] - 16:25

## 7

**731-0019** [1] - 1:18
**74** [1] - 35:13
**77** [1] - 35:2
**78** [1] - 35:2

## 9

**961-9437** [1] - 1:14
**99** [1] - 1:13
**9:30** [2] - 58:11

## A

**abandoned** [1] - 53:22
**ability** [4] - 29:11, 33:9, 49:17, 56:20
**able** [1] - 30:11
**above-entitled** [1] - 59:5
**absolutely** [1] - 32:8
**abuse** [6] - 11:12, 36:1, 37:6, 43:17, 49:15, 55:8
**abuse-love** [1] - 43:17
**abused** [7] - 20:16, 20:18, 20:20, 29:8, 29:9, 29:15, 31:16
**abuser** [7] - 29:5, 30:3, 33:7, 33:8, 33:12, 43:11, 43:13
**abuser's** [1] - 37:7
**abusive** [9] - 12:20, 12:23, 13:1, 13:4, 13:7, 13:21, 35:25, 44:9, 49:14

**Academy** [2] - 22:10, 22:14
**accent** [1] - 26:20
**acceptable** [1] - 17:12
**accepted** [1] - 9:7
**accomplished** [1] - 23:16
**accomplishment** [1] - 22:25
**according** [1] - 54:8
**account** [1] - 10:20
**accredited** [1] - 21:18
**accruing** [1] - 46:16
**accurate** [2] - 23:14, 59:4
**achievement** [2] - 18:14, 22:22
**acknowledge** [1] - 33:3
**activity** [2] - 45:22, 48:25
**addition** [1] - 12:4
**additional** [1] - 6:23
**adjourn** [1] - 58:10
**adjourned** [1] - 58:18
**administrative** [1] - 9:16
**ADMITTED** [2] - 2:10
**admitted** [1] - 9:17
**adults** [1] - 29:10
**advantage** [1] - 30:14
**adviser** [1] - 19:12
**Advocate** [1] - 19:19
**advocates** [2] - 19:1, 22:20
**Affairs** [1] - 15:2
**affect** [3] - 33:9, 37:6, 54:13
**affection** [1] - 26:22
**afternoon** [4] - 3:12, 3:13, 41:3, 41:4
**agencies** [1] - 19:16
**agency** [1] - 20:2
**agent** [1] - 17:8
**agents** [3] - 7:3, 7:18, 28:18
**ago** [3] - 3:23, 28:9
**agree** [10] - 43:2, 43:18, 43:19, 44:12, 44:15, 46:5, 46:9, 46:10, 46:25, 48:4
**ahead** [3] - 10:3, 10:4, 28:15
**airport** [1] - 26:9
**AI** [6] - 45:11, 45:12, 45:18, 45:20, 45:22, 45:25
**Al-Qaida** [6] - 45:11, 45:12, 45:18, 45:20, 45:22, 45:25

**alive** [1] - 27:7
**alleged** [2] - 48:9, 50:8
**Alliance** [1] - 18:24
**alliance** [1] - 39:23
**allowed** [2] - 12:10, 26:13
**almost** [4] - 10:11, 11:10, 12:18, 50:19
**alters** [1] - 27:8
**Altman** [1] - 57:17
**ALTMAN** [11] - 1:12, 3:11, 25:21, 26:2, 40:14, 42:16, 47:1, 50:10, 50:13, 58:5, 58:17
**ALTONAGA** [1] - 1:9
**AMA** [1] - 14:18
**America** [1] - 28:9
**AMERICA** [1] - 1:3
**American** [6] - 14:16, 14:18, 14:20, 15:4, 21:23, 33:16
**Americans** [2] - 45:12, 45:17
**amount** [1] - 50:7
**anally** [2] - 36:13, 53:21
**analysis** [1] - 43:7
**analyze** [1] - 45:17
**anger** [1] - 30:24
**angry** [1] - 30:21
**animals** [1] - 37:9
**annual** [3] - 14:7, 22:13, 22:20
**antenna** [1] - 29:10
**anxiety** [1] - 48:1
**apologies** [1] - 11:13
**apology** [1] - 36:2
**appear** [1] - 35:10
**APPEARANCES** [1] - 1:10
**appeared** [3] - 35:3, 35:6, 57:19
**application** [2] - 48:15, 48:20
**applied** [3] - 32:6, 45:22, 47:8
**applies** [1] - 37:17
**appointed** [4] - 7:1, 19:25, 20:8, 20:10
**appointments** [2] - 38:25, 51:2
**approach** [1] - 42:17
**appropriate** [1] - 44:21
**approved** [1] - 26:15
**area** [2] - 12:14, 47:9
**Ariel** [2] - 25:12, 25:15
**army** [1] - 33:18

**Army** [1] - 45:25
**article** [6] - 23:13, 42:11, 42:14, 42:15, 42:20, 42:23
**articles** [7] - 23:6, 23:7, 23:16, 23:18, 23:22, 24:11, 48:14
**Asian** [1] - 15:4
**aspects** [1] - 50:5
**assigned** [2] - 5:20, 23:21
**assignment** [1] - 6:23
**Assistance** [1] - 22:18
**Assistant** [1] - 1:12
**assistant** [2] - 6:16, 6:17
**assisted** [1] - 39:16
**associate** [2] - 7:12, 52:12
**associated** [1] - 24:8
**association** [1] - 18:16
**Association** [3] - 14:16, 14:19, 14:20
**associations** [1] - 14:15
**assume** [1] - 27:6
**assure** [1] - 39:1
**attached** [1] - 29:1
**attachment** [2] - 27:10, 28:12
**attained** [1] - 7:11
**attention** [3] - 7:2, 10:16, 16:1
**Attorney** [1] - 1:12
**attorney** [1] - 7:1
**Australia** [5] - 21:6, 35:14, 38:15, 44:22, 57:8
**authority** [1] - 11:9
**Avenue** [2] - 1:22, 59:9
**average** [2] - 25:7, 26:7
**avoidance** [1] - 47:25
**avoided** [1] - 13:17
**award** [6] - 18:14, 22:10, 22:13, 22:17, 22:20, 22:22
**awards** [1] - 22:7
**aware** [2] - 48:11, 48:12
**awareness** [1] - 48:1
**awhile** [1] - 21:11

## B

**background** [2] - 5:11, 7:16
**backgrounds** [1] -

16:16
**balance** [1] - 28:5
**bank** [6] - 10:5, 10:7, 10:8, 10:10, 10:16, 26:9
**base** [1] - 33:18
**based** [3] - 10:2, 17:14, 41:15
**basic** [1] - 43:15
**basis** [1] - 41:13
**BASTON** [1] - 1:6
**battered** [23] - 11:5, 11:16, 15:21, 16:18, 20:14, 25:23, 27:15, 29:4, 29:14, 30:2, 31:16, 32:12, 33:4, 34:1, 34:15, 34:17, 34:18, 35:18, 39:22, 55:1, 55:5, 55:8
**battering** [2] - 8:24, 48:9
**beat** [3] - 40:9, 56:25, 57:10
**beaten** [1] - 11:6
**became** [6] - 6:17, 6:19, 6:24, 11:1, 17:9
**become** [2] - 13:13, 18:2
**becoming** [1] - 17:12
**BEFORE** [1] - 1:9
**began** [1] - 21:2
**begin** [3] - 15:25, 30:14, 58:10
**beginning** [1] - 31:4
**begun** [1] - 8:25
**behalf** [2] - 25:16, 25:18
**behavior** [5] - 15:24, 37:10, 37:13, 37:14, 37:15
**benefit** [1] - 7:24
**benefits** [1] - 20:5
**best** [2] - 8:10, 14:22
**better** [7] - 16:23, 18:7, 21:12, 30:23, 39:24, 40:1
**between** [4] - 5:7, 16:23, 25:4, 43:16
**bidding** [1] - 11:11
**big** [1] - 55:13
**biology** [1] - 56:15
**birth** [1] - 27:4
**birthday** [1] - 45:6
**bit** [12] - 5:22, 8:21, 11:18, 11:24, 14:14, 16:2, 20:22, 26:4, 30:10, 33:6, 33:7, 55:7
**black** [1] - 15:4

**blatantly** [1] - 29:7
**blue** [2] - 26:8, 37:19
**Board** [1] - 21:23
**board** [7] - 19:8, 19:23, 20:9, 21:15, 23:20, 23:25, 52:8
**boards** [1] - 23:23
**body** [3] - 20:1, 47:23, 56:13
**bond** [45] - 11:4, 11:12, 11:15, 26:4, 27:1, 28:2, 28:4, 28:6, 28:21, 29:22, 30:12, 32:15, 35:19, 37:20, 38:6, 38:9, 39:13, 39:23, 43:19, 43:24, 44:1, 44:2, 44:6, 48:24, 49:1, 50:7, 52:18, 53:6, 53:18, 53:19, 54:3, 54:4, 54:13, 54:14, 54:15, 54:16, 54:17, 55:9, 55:15, 55:17, 56:3, 56:7, 56:15, 56:16
**bonded** [1] - 33:4
**bonding** [11] - 9:22, 9:25, 11:8, 18:17, 25:22, 28:15, 29:14, 29:19, 30:2, 43:22, 54:24
**bonds** [1] - 19:20
**bono** [1] - 51:19
**book** [3] - 17:7, 17:9, 17:10
**booking** [1] - 39:17
**books** [2] - 15:12, 23:5
**born** [1] - 49:14
**bought** [1] - 52:15
**Boulevard** [1] - 1:17
**bound** [3] - 10:24, 28:25, 31:5
**brain** [3] - 24:13, 24:14, 24:15
**brainwash** [1] - 32:4
**brainwashed** [2] - 32:2, 32:3
**brainwashing** [2] - 32:11, 32:14
**breakfast** [1] - 37:3
**breaks** [1] - 55:9
**bridge** [1] - 3:18
**briefly** [1] - 8:7
**Brigades** [2] - 17:17, 45:24
**bring** [2] - 19:20, 20:11
**bringing** [1] - 7:7
**broader** [1] - 43:20

**broke** [1] - 10:14
**brothels** [1] - 44:23
**brotherly/sisterly** [1] - 27:10
**brought** [3] - 10:7, 10:9, 15:15
**Broward** [1] - 1:17
**budget** [2] - 8:9, 19:15
**business** [4] - 46:6, 46:8, 46:11, 46:21
**BY** [7] - 1:21, 3:11, 26:2, 41:2, 43:6, 47:4, 50:13

## C

**cabinet** [2] - 8:3, 52:5
**cabinet-level** [1] - 52:5
**calculate** [1] - 41:12
**cancel** [1] - 51:2
**canceled** [1] - 51:21
**cannot** [1] - 48:7
**capped** [1] - 41:20
**captive** [2] - 54:4, 54:8
**captivity** [4] - 45:13, 45:18, 45:21, 54:16
**captured** [5] - 11:5, 26:8, 33:20, 33:21
**care** [2] - 9:18, 56:1
**career** [8] - 5:12, 5:13, 13:20, 22:6, 23:2, 31:14, 35:19, 53:1
**carefully** [1] - 23:14
**caring** [2] - 21:13, 57:15
**Carver** [3] - 42:7, 42:8, 43:7
**CASE** [1] - 1:2
**case** [34] - 10:3, 10:21, 14:9, 25:6, 25:11, 26:25, 27:11, 28:19, 33:19, 34:24, 39:16, 40:18, 41:20, 44:15, 46:3, 46:12, 47:6, 47:8, 47:14, 47:15, 48:4, 49:7, 49:23, 50:1, 50:2, 50:4, 50:5, 53:7, 54:20, 54:23, 54:24, 55:2
**cases** [4] - 17:23, 25:10, 36:4, 46:5
**Castro** [2] - 25:12, 25:15
**catastrophe** [1] - 21:7
**catch** [1] - 45:15
**categories** [1] - 47:21
**category** [1] - 44:6
**Catholic** [1] - 8:16
**caught** [1] - 28:19

**CECILIA** [1] - 1:9
**Center** [2] - 19:13, 20:22
**center** [2] - 8:5, 21:14
**certain** [5] - 15:12, 26:20, 47:20, 47:25, 50:7
**certainly** [3] - 13:23, 29:8, 31:22
**Certificate................ ....** [1] - 2:18
**certified** [1] - 21:15
**certify** [1] - 59:3
**chair** [3] - 15:1, 21:14, 53:22
**chaired** [2] - 15:1, 16:8
**change** [3] - 38:1, 38:12, 38:15
**changed** [5] - 15:24, 48:20
**changes** [1] - 55:10
**chapters** [1] - 23:5
**character** [1] - 56:15
**charge** [1] - 47:12
**charts** [2] - 13:24, 14:3
**child** [4] - 13:11, 19:6, 29:6, 55:24
**childhood** [1] - 49:16
**children** [1] - 29:9
**CHOE** [1] - 1:11
**choice** [1] - 13:12
**chose** [1] - 27:17
**chosen** [2] - 23:15, 30:13
**Christmas** [1] - 45:8
**circumstance** [4] - 11:17, 38:3, 43:24, 45:9
**circumstances** [2] - 17:21, 54:16
**cities** [1] - 16:19
**citing** [1] - 23:15
**City** [1] - 3:18
**city** [1] - 16:25
**classes** [1] - 19:5
**classically** [1] - 45:10
**cleaning** [1] - 37:2
**clearly** [1] - 10:17
**Cleveland** [2] - 25:11, 27:24
**client** [2] - 36:14, 36:18
**client's** [1] - 56:21
**clinging** [1] - 28:20
**clinic** [1] - 13:24
**clinical** [3] - 11:20, 11:22, 47:18

**clinician** [1] - 12:19
**close** [3] - 17:9, 32:6, 34:22
**closer** [1] - 28:22
**clubs** [1] - 44:24
**Coast** [2] - 6:19, 35:3
**coerced** [1] - 29:25
**coercion** [1] - 14:11
**collapse** [1] - 8:9
**colleague** [1] - 10:9
**colleagues** [2] - 9:9, 13:13
**college** [1] - 3:25
**Columbia** [1] - 21:5
**combat** [2] - 18:22, 24:16
**coming** [5] - 9:24, 13:9, 27:1, 30:14, 33:17
**command** [1] - 7:20
**comment** [1] - 48:7
**commentary** [2] - 47:1, 47:3
**commercial** [2] - 48:15, 48:19
**Commission** [1] - 19:24
**commission** [1] - 20:8
**commissioned** [1] - 16:16
**commissioner** [1] - 8:3
**commitment** [1] - 57:15
**committee** [4] - 15:4, 15:7, 15:10, 52:8
**committees** [5] - 14:15, 14:21, 14:23, 14:25, 15:3
**common** [3] - 18:6, 30:7, 30:8
**commonality** [1] - 50:6
**community** [1] - 6:21
**compassion** [1] - 26:20
**compassionate** [1] - 33:13
**compensation** [1] - 20:10
**compliance** [1] - 37:6
**complicated** [1] - 56:14
**concentration** [1] - 48:2
**concept** [5] - 10:2, 15:23, 29:22, 43:20, 45:23
**concepts** [2] - 9:20, 12:2

concerning [2] - 48:14, 49:7
concluded [1] - 43:5
conditions [1] - 28:11
conduct [2] - 7:4, 45:17
conferred [1] - 18:15
confidence [1] - 31:7
confused [1] - 33:1
confusing [1] - 32:20
confusion [1] - 32:23
Congress [1] - 7:23
Congressional [1] - 7:21
Conrad [1] - 17:10
conscience [1] - 13:15
consider [1] - 13:7
consistent [13] - 32:11, 32:23, 33:1, 34:14, 35:17, 35:20, 38:8, 38:10, 39:12, 39:14, 39:21, 39:23
constituencies [1] - 7:22
consult [2] - 12:15, 14:21
continue [1] - 55:16
control [1] - 55:19
controlling [2] - 44:9, 48:2
controversial [1] - 33:19
convention [1] - 15:15
conventions [1] - 19:17
conversations [1] - 7:4
convoy [1] - 13:11
correct [10] - 38:18, 38:19, 42:2, 44:4, 45:1, 45:4, 45:9, 45:12, 54:8, 55:5
counsel [2] - 42:17, 54:11
Counsel [2] - 6:25, 15:2
counselor [2] - 40:16, 44:17
Counselor [1] - 57:17
counterterrorism [1] - 6:25
counties [1] - 16:19
countries [1] - 12:15
country [5] - 4:19, 16:25, 17:2, 51:10, 52:9
county [1] - 50:1
County [1] - 50:2
couple [1] - 19:14

courage [1] - 28:6
course [16] - 9:12, 12:18, 13:20, 20:6, 20:13, 22:6, 23:2, 29:3, 31:14, 33:11, 35:18, 38:4, 38:7, 52:25, 53:15, 53:22
COURT [17] - 1:1, 3:2, 3:8, 25:24, 40:17, 40:19, 40:22, 40:24, 42:17, 42:19, 42:25, 43:4, 47:3, 58:3, 58:7, 58:13, 58:15
Court [3] - 1:21, 2:18, 59:8
court [6] - 20:11, 24:19, 24:22, 25:7, 31:11, 38:22
courtroom [4] - 40:20, 40:23, 42:1, 58:14
Courtroom [1] - 1:6
cover [1] - 21:7
covering [1] - 21:4
create [2] - 11:14, 16:6
creates [1] - 39:23
creating [1] - 39:16
credited [2] - 10:1, 45:19
Crime [3] - 19:13, 19:22, 19:24
crime [8] - 18:25, 19:16, 19:17, 20:3, 20:7, 21:7, 30:20
criminal [4] - 19:5, 25:16, 25:18, 57:20
criteria [7] - 42:23, 42:24, 43:2, 43:7, 43:16, 43:18, 48:5
CROSS [2] - 2:3, 41:1
CROSS-EXAMINATION [1] - 41:1
cruelties [1] - 57:17
C.S. [1] - 34:11
Cuyahoga [1] - 50:2

D

Daddy [1] - 55:22
Dallas [1] - 35:9
DAMION [1] - 1:6
dancing [1] - 44:24
dangerous [1] - 55:25
Dart [2] - 20:22, 20:24
DATE [1] - 59:8
dates [1] - 36:11
DAVID [1] - 1:16
David [1] - 1:16
davidRowe28@ gmail.com [1] - 1:19

DAY [1] - 1:8
days [3] - 3:23, 31:10, 34:11
deadly [2] - 7:9, 10:22
deal [1] - 56:17
dealing [3] - 6:25, 7:21, 56:14
death [2] - 40:12, 57:11
decades [2] - 12:18, 28:9
decided [2] - 8:1, 22:13
deep [2] - 9:11, 13:13
defendant [23] - 25:16, 32:19, 34:4, 35:3, 35:5, 35:6, 35:10, 35:14, 36:10, 36:24, 37:2, 39:8, 39:11, 39:16, 40:7, 40:9, 40:11, 45:3, 56:24, 57:2, 57:4, 57:9, 57:10
Defendant [1] - 1:7
DEFENDANT [2] - 1:16, 2:7
defendant's [1] - 55:21
Defendant's [1] - 2:13
defendants [1] - 25:18
defer [1] - 47:7
define [1] - 15:18
defined [3] - 43:24, 45:20, 47:20
defining [3] - 10:1, 16:4, 45:20
definitely [1] - 34:2
definition [2] - 17:22, 29:21
degradation [1] - 55:15
deliberate [1] - 32:4
demanded [1] - 10:8
demanding [1] - 10:15
demonstrated [1] - 9:22
demoralize [1] - 16:24
denied [2] - 10:13, 33:5
denigration [1] - 48:9
department [1] - 25:6
Department [3] - 4:17, 8:14, 8:15
deputy [1] - 6:16
described [1] - 53:21
describes [1] - 27:20
describing [4] - 13:22, 30:12, 32:11, 32:17
deserved [1] - 20:10
despite [1] - 11:7

detail [2] - 9:21, 26:4
detailed [1] - 7:14
details [1] - 5:16
determine [1] - 48:8
develop [3] - 9:2, 15:3, 19:19
developed [6] - 21:13, 26:22, 33:14, 44:13, 45:11, 45:16
developing [2] - 16:22, 16:23
development [1] - 45:23
diagnosed [3] - 47:17, 47:18, 48:5
diagnoses [1] - 15:12
diagnosis [7] - 9:1, 9:7, 9:8, 9:9, 15:20, 16:6, 18:6
die [3] - 26:11, 26:12
died [2] - 20:24, 25:14
difference [3] - 5:6, 48:25, 56:8
differences [2] - 15:16, 56:9
different [11] - 7:22, 17:1, 17:21, 22:15, 33:11, 43:25, 48:23, 49:5, 50:4, 50:5, 56:3
differentiate [1] - 56:6
differentiation [1] - 34:14
differently [2] - 33:24, 33:25
difficulty [1] - 48:2
dignity [4] - 15:22, 33:5, 55:18, 56:1
dilemma [1] - 57:14
diminish [1] - 55:18
diminished [1] - 15:22
diminishing [1] - 55:24
DIRECT [3] - 2:3, 3:9, 26:1
direct [1] - 8:17
directly [1] - 13:23
director [12] - 6:16, 6:17, 6:18, 6:19, 6:20, 7:12, 7:16, 8:4, 12:10, 25:5, 52:5, 52:12
directors [2] - 19:9, 19:23
disagree [2] - 43:3, 46:25
disagreed [1] - 20:10
discover [1] - 9:10
discuss [2] - 18:17, 40:18

discussion [2] - 47:10, 47:13
Disorder [1] - 16:13
disorder [13] - 7:2, 9:1, 9:3, 12:2, 15:13, 16:5, 16:21, 47:18, 48:6, 48:13, 48:15, 48:21, 48:22
distress [1] - 47:16
distribute [1] - 19:16
distributes [1] - 20:2
DISTRICT [3] - 1:1, 1:1, 1:9
Division [1] - 6:20
DIVISION [1] - 1:2
Doctor [1] - 50:25
doctor [4] - 26:3, 28:24, 55:12, 58:3
doctors [2] - 5:8, 18:3
dog [1] - 11:10
dollars [2] - 39:18, 41:10
dominated [1] - 28:11
done [3] - 10:25, 13:16, 32:5
door [1] - 54:17
Dr [20] - 3:3, 3:24, 11:20, 21:15, 23:2, 24:19, 25:22, 29:13, 31:9, 40:15, 41:3, 41:5, 42:7, 42:8, 43:7, 47:2, 50:14, 51:25, 53:1, 58:2
dr [2] - 3:12, 3:17
dramatically [1] - 50:4
drive [1] - 58:12
Dubai [1] - 35:5, 45:7
dues [1] - 14:21
during [9] - 7:5, 9:12, 9:21, 17:3, 18:16, 20:13, 22:6, 31:14, 38:7
duty [1] - 13:15

E

E-mail [2] - 35:13, 38:14, 40:6, 57:7
early [1] - 58:10
eat [2] - 26:13, 26:24
edited [1] - 23:5
editor [1] - 17:17
editorial [3] - 23:20, 23:23, 23:25
Education [1] - 4:17
education [1] - 56:8
effect [1] - 55:14
effects [3] - 37:5, 55:4, 55:7
efforts [1] - 15:11

June 19, 2014

U.S.A. v. Damion St. Patrick Baston, 13-20914-CR

**either** [1] - 44:23
**electronic** [1] - 24:11
**elements** [2] - 44:20, 48:12
**eligibility** [1] - 20:12
**eligible** [2] - 20:4, 20:7
**eliminate** [1] - 7:17
**embarrassed** [2] - 30:21
**embarrassing** [2] - 21:22, 30:19
**embarrassment** [1] - 31:21
**emotional** [3] - 21:12, 33:21, 53:18
**emotionally** [5] - 10:24, 24:16, 28:25, 31:6, 33:4
**emotions** [1] - 47:25
**encounter** [2] - 9:21, 20:13
**end** [3] - 5:13, 26:9, 29:9
**ended** [2] - 7:12, 16:25
**ends** [1] - 11:10
**enforcement** [3] - 7:4, 16:24, 39:4
**engage** [1] - 14:12
**engagement** [1] - 10:14
**engagements** [2] - 51:6, 51:20
**England** [1] - 4:3
**ensure** [1] - 16:18
**entered** [1] - 40:23
**entitled** [1] - 59:5
**entry** [1] - 6:18
**entry-level** [1] - 6:18
**environment** [1] - 48:19
**escape** [4] - 43:15, 50:6, 53:16, 54:12
**escaped** [1] - 25:13
**ESQ** [3] - 1:11, 1:12, 1:16
**essentially** [1] - 46:6
**establish** [2] - 8:18, 21:1
**establishing** [1] - 43:16
**esteem** [1] - 55:11
**estimate** [1] - 13:19
**Europe** [1] - 17:15
**event** [2] - 47:19, 47:24
**events** [2] - 16:24, 18:8
**eventually** [1] - 25:13
**evidence** [1] - 37:23,

39:15
**EVIDENCE** [1] - 2:10
**evoke** [1] - 36:2
**evoked** [1] - 47:23
**evolution** [1] - 9:6
**evolved** [2] - 17:23, 21:5
**exaggerated** [1] - 48:3
**exam** [2] - 21:19, 21:20
**EXAMINATION** [4] - 3:9, 26:1, 41:1, 50:12
**examine** [1] - 48:8
**examiner** [2] - 21:23, 22:4
**example** [8] - 25:9, 29:4, 30:3, 34:3, 53:21, 55:21, 55:22, 57:7
**except** [1] - 12:9
**EXCERPT** [1] - 1:8
**excerpt** [2] - 3:1, 58:18
**executive** [2] - 6:17, 9:16
**Exhibit** [4] - 2:12, 2:13, 35:2, 35:13
**EXHIBITS** [1] - 2:10
**exist** [2] - 52:22, 55:16
**existed** [2] - 52:19, 54:24
**existence** [2] - 19:2, 47:20
**exists** [1] - 48:23
**exited** [2] - 40:20, 58:14
**expect** [1] - 8:12
**expected** [3] - 8:22, 21:21, 37:13
**expenses** [2] - 20:7, 46:20, 46:23
**experience** [4] - 15:20, 19:9, 28:14, 31:3
**experiencing** [1] - 32:16
**expert** [7] - 24:20, 24:22, 25:3, 25:14, 25:19, 41:9, 42:19
**expertise** [1] - 47:9
**explain** [2] - 27:23, 38:4
**explicitly** [1] - 29:7
**exploits** [1] - 49:22
**exposed** [2] - 14:1, 24:17
**expression** [2] - 31:20, 49:11
**expressions** [1] -

57:15
**extensively** [3] - 45:11, 45:16, 45:17

## F

**fact** [18] - 28:17, 29:5, 29:24, 38:4, 38:11, 38:14, 40:2, 40:5, 46:5, 48:18, 51:8, 51:20, 52:19, 54:22, 56:23, 56:24, 57:7, 57:9
**factor** [1] - 43:22
**factors** [3] - 49:6, 56:3, 56:6
**facts** [1] - 46:10
**failed** [1] - 25:19
**failure** [1] - 53:18
**fair** [6] - 22:6, 31:9, 31:12, 33:24, 51:17, 54:5
**fairness** [1] - 38:17
**falls** [1] - 10:12
**familiar** [2] - 42:7, 42:11
**families** [1] - 40:12
**family** [6] - 20:5, 20:25, 29:15, 29:16, 33:18, 57:5
**Family** [1] - 24:3
**famous** [2] - 5:25, 25:10
**fancy** [1] - 24:14
**fantasy** [1] - 39:24
**far** [2] - 47:10, 55:11
**fatherly** [1] - 26:22
**favorite** [1] - 15:5
**FBI** [7] - 7:3, 10:19, 10:20, 17:4, 17:8, 17:12, 28:18
**fear** [1] - 27:13
**federal** [7] - 6:9, 16:18, 20:4, 24:19, 49:23, 50:1, 50:3
**fee** [1] - 50:14
**feelings** [3] - 10:18, 10:25, 36:3
**fellowship** [2] - 5:14, 5:16
**felt** [10] - 7:24, 20:9, 27:12, 27:21, 30:20, 36:5, 36:6, 36:7, 44:20
**few** [6] - 15:1, 19:1, 22:8, 28:9, 30:17, 35:9
**fiancee** [1] - 19:7
**field** [4] - 15:23, 23:1, 23:17, 28:8

**fields** [3] - 23:11, 24:24, 25:22
**fight** [1] - 26:19
**film** [1] - 38:20
**finally** [2] - 21:25, 30:11
**findings** [1] - 23:12
**finished** [1] - 6:5
**first** [14] - 4:23, 8:18, 10:3, 20:24, 21:10, 21:14, 27:5, 30:17, 30:25, 33:17, 42:3, 47:21, 49:9
**five** [5] - 3:23, 14:1, 20:1, 20:8, 34:9
**flashbacks** [2] - 24:16, 47:23
**flights** [1] - 39:17
**Floor** [2] - 1:22, 59:9
**FLORIDA** [1] - 1:1
**Florida** [9] - 1:3, 1:13, 1:18, 1:23, 19:25, 41:18, 49:9, 59:9
**focused** [1] - 16:21
**follow** [1] - 14:8
**followed** [1] - 34:22
**following** [2] - 3:1, 43:5
**follows** [1] - 3:6
**FOR** [4] - 1:11, 1:16, 2:4, 2:7
**force** [9] - 5:25, 7:1, 14:10, 14:11, 16:2, 16:4, 17:4, 17:8, 52:9
**Force** [1] - 16:12
**forced** [2] - 36:14, 36:17
**forces** [4] - 14:15, 14:24, 15:1, 16:19
**foregoing** [1] - 59:3
**forensic** [2] - 5:15, 8:5
**forever** [1] - 28:4
**form** [1] - 27:6
**Fort** [1] - 1:18
**forth** [2] - 11:14, 42:23
**founders** [1] - 18:12
**four** [11] - 10:7, 10:10, 12:18, 20:1, 31:10, 42:23, 42:24, 43:1, 43:7, 43:15, 43:18
**Fourth** [1] - 1:13
**fraction** [1] - 34:19
**Francisco** [1] - 4:15
**Frank** [1] - 2:5
**FRANK** [1] - 3:5
**frank** [1] - 3:16
**free** [5] - 28:5, 31:8, 33:21, 53:25
**freedom** [2] - 33:5,

53:17
**friend** [2] - 10:23, 19:12
**friends** [1] - 17:9
**friendship** [1] - 27:9
**front** [2] - 19:8, 51:21
**funds** [1] - 20:2
**funeral** [1] - 20:5
**future** [1] - 46:18

## G

**gain** [1] - 33:9
**gender** [1] - 15:16
**general** [1] - 53:17
**general's** [1] - 7:1
**generally** [1] - 44:12
**generated** [2] - 18:25, 27:11
**generation** [2] - 4:23, 9:9
**gentlemen** [3] - 3:2, 40:17, 58:9
**George** [1] - 3:18
**gift** [6] - 27:4, 27:13, 32:20, 34:22, 34:23, 36:2
**gifts** [3] - 11:13, 26:16, 35:6
**girl** [2] - 49:1, 49:2
**girls** [3] - 27:24, 46:19, 48:6
**given** [2] - 22:22, 28:16
**Gloria** [1] - 15:15
**goals** [1] - 17:1
**Gold** [1] - 35:2
**golden** [1] - 22:10
**golf** [1] - 53:22
**goodness** [1] - 31:2
**government** [9] - 6:9, 16:18, 17:1, 25:17, 38:19, 41:19, 49:23, 50:16, 52:23
**Government** [1] - 3:6
**GOVERNMENT** [2] - 1:11, 2:4
**Government's** [3] - 2:12, 35:2, 35:13
**government's** [1] - 25:14
**governments** [1] - 16:18
**governor** [3] - 8:2, 20:1, 20:8
**graduate** [3] - 4:4, 4:6, 4:10
**granted** [1] - 26:16
**grateful** [2] - 27:7, 35:10

gratitude [1] - 27:6
great [1] - 56:17
group [6] - 14:20,
   16:14, 17:19, 18:25,
   22:15, 23:21
groups [1] - 14:19
grow [3] - 3:17, 27:8,
   33:2
guess [1] - 17:12
guy [1] - 22:2

## H

hand [1] - 3:3
happy [13] - 35:3,
   35:7, 35:11, 35:22,
   35:23, 36:5, 36:8,
   38:12, 40:2, 40:3,
   40:5, 57:19
hard [4] - 27:23, 28:3,
   31:20, 33:2
harm [1] - 40:12
harming [1] - 28:23
Harvard [1] - 4:1
Hassel - 17:11
heal [1] - 33:12
healing [1] - 33:13
Health [15] - 4:15,
   4:16, 4:17, 4:18, 6:7,
   6:8, 6:12, 6:20, 7:11,
   7:20, 8:1, 8:14, 8:15,
   17:13, 52:13
health [15] - 6:9, 6:10,
   6:19, 6:21, 7:8, 7:14,
   7:22, 7:24, 8:4, 8:5,
   8:17, 12:9, 16:15,
   25:5, 52:6
hear [11] - 5:22, 32:1,
   32:18, 32:21, 34:3,
   34:12, 34:23, 35:15,
   36:9, 36:20, 50:10
heard [6] - 14:18,
   32:3, 35:22, 36:4,
   47:13, 47:14
hearing [1] - 25:15
hearsay [2] - 42:16,
   42:19
heart [1] - 55:10
heightened [1] - 48:1
held [12] - 3:1, 10:7,
   17:15, 17:17, 17:18,
   17:19, 25:12, 26:23,
   27:16, 53:7, 54:3,
   56:19
help [8] - 7:23, 8:17,
   13:14, 13:17, 18:7,
   21:8, 28:24, 55:12
helped [4] - 16:5,
   17:7, 19:11, 21:1
helpful [1] - 30:16

helping [5] - 7:17, 9:2,
   14:4, 15:3, 15:18
helpless [1] - 27:3
help [1] - 19:19
hereby [1] - 59:3
herself [2] - 55:10,
   55:11
highest [2] - 7:11,
   18:13
Hispanic [1] - 15:5
history [1] - 4:3
hit [1] - 37:2
hold [2] - 19:17, 55:11
holders [1] - 10:13
holding [2] - 7:5,
   26:15
Holland - 17:18
Holmes [1] - 6:3
home [4] - 13:9,
   25:12, 33:17, 58:12
Honor [5] - 25:21,
   40:14, 42:16, 47:1,
   50:9, 58:5
honor [1] - 18:14
HONORABLE [1] - 1:9
honors [1] - 4:6
hooding [1] - 32:5
Hopkins [3] - 4:9,
   4:10, 4:13
hospital [1] - 9:17
Hospital [2] - 4:15,
   4:16
hospitals [3] - 4:19,
   6:22, 8:6
hostage [17] - 7:3,
   10:8, 10:13, 10:22,
   10:24, 16:20, 16:22,
   17:6, 17:15, 26:23,
   27:16, 44:13, 44:16,
   44:18, 45:3, 45:10,
   53:7
hostage-taker [1] -
   10:24
hostages [7] - 7:5,
   10:10, 10:12, 44:25,
   45:8, 45:9, 53:10
hot [1] - 36:17
hour [4] - 41:8, 41:10,
   41:17
hourly [4] - 41:5, 41:7,
   41:13
House [1] - 17:20
house [4] - 19:8, 37:2,
   49:24, 53:11
houses [1] - 56:21
human [1] - 49:21
humanity [1] - 15:22
humans [2] - 37:8,
   37:10
humiliation - 55:14

hundreds [2] - 13:23,
   39:17
hurt [1] - 36:6
husband [1] - 11:7
hysterical [1] - 15:13

## I

identified [1] - 57:18
ill [1] - 15:25
illusion [1] - 46:17
images [1] - 48:10
imaging [1] - 24:14
impair [1] - 49:17
implied [1] - 54:10
important [3] - 13:8,
   19:20, 21:2
imposing [1] - 55:23
impossible [1] - 53:19
IN [1] - 2:10
inability [1] - 43:15
incest [1] - 8:24
incidents [1] - 48:18
included [1] - 38:20
includes [1] - 11:4
including [1] - 49:6
inconsistent [7] -
   32:12, 32:23, 34:15,
   35:17, 38:9, 39:12,
   39:21
increases [1] - 55:19
individuals [1] - 57:16
infants [1] - 27:2
information [1] -
   19:20
informed [1] - 33:14
informs [1] - 38:6
inhumane [1] - 57:20
injured [1] - 20:6
injuries [1] - 13:13
injury [1] - 13:12
insights [1] - 7:8
insomnia [1] - 48:2
instance [1] - 44:22
instead [2] - 10:6,
   22:2
Institute [7] - 5:21,
   6:8, 6:11, 7:10, 7:20,
   7:25, 52:13
instructions [1] - 37:7
interactions [3] - 29:3,
   34:15, 39:11
interest [1] - 9:11
interesting [1] - 13:8
interests [1] - 21:1
intermittent [2] - 37:9,
   37:14
intern [1] - 4:14
International [3] -

17:25, 18:8, 24:9
Internationality [1] -
   22:23
Internet [1] - 12:16
internship [1] - 4:23
interview [1] - 47:19
interviewed [4] - 17:5,
   17:16, 17:17, 17:19
interviewing [2] -
   17:15, 26:9
intimate [1] - 30:19
introduce [1] - 12:2
invent [1] - 9:25
investigation [2] -
   37:17, 38:5
investigative [1] -
   38:20
involved [12] - 10:20,
   12:19, 12:22, 12:25,
   13:3, 13:6, 13:21,
   14:23, 16:10, 24:15,
   25:6, 25:10
involvement [1] - 9:6
involves [1] - 11:12
involving [1] - 46:3
irrational [1] - 37:18
isolated [1] - 43:14
isolation [2] - 43:12,
   43:13
issue [1] - 48:23
issues [3] - 16:5,
   18:17, 56:14
Italian [1] - 26:20

## J

J.R. [2] - 37:1, 38:18
Jamaica [1] - 45:2
Japanese [1] - 45:25
job [1] - 30:25
Johns [3] - 4:9, 4:10,
   4:12
join [3] - 8:2, 14:21,
   15:6
joined [1] - 6:7
Joseph [2] - 42:7,
   42:8
Journal [3] - 24:3,
   24:5, 24:8
journal [1] - 24:8
Journalism [1] - 20:23
journalism [2] - 21:3
journalist [1] - 21:10
journalists [2] - 21:7,
   21:8
journals [2] - 23:12,
   23:13
Judge [1] - 58:17
JUDGE [1] - 1:9
judgments [1] - 29:11

June [1] - 1:4
juries [1] - 39:20
jurisdiction [1] - 50:3
jurors [16] - 3:24,
   4:12, 4:22, 5:6, 5:18,
   6:14, 8:7, 11:24,
   13:19, 14:16, 16:12,
   21:17, 23:9, 25:9,
   38:23, 39:20
JURY [1] - 1:8
jury [9] - 40:20, 40:23,
   42:18, 51:21, 52:17,
   52:21, 53:4, 58:7,
   58:14
justice [1] - 19:5

## K

K.L. [2] - 32:1,
   34:7
K.L. [8] - 35:2, 35:5,
   35:9, 35:14, 36:16,
   37:1, 38:14, 57:7
kept [2] - 15:14, 49:24
kicked [1] - 27:18
kidnapped [1] - 28:19
kidnapper [1] - 28:19
kidnapping [11] -
   28:19, 47:6, 47:8,
   47:10, 47:12, 47:13,
   47:14, 47:15, 54:19,
   54:22
kidnappings [1] - 17:5
kill [5] - 26:23, 27:13,
   28:13, 29:1, 57:4
killed [2] - 19:7, 27:12
kind [7] - 15:10, 19:10,
   24:17, 34:23, 37:6,
   55:14
kindness [1] - 43:11
kinds [5] - 7:19, 13:21,
   18:8
knife [1] - 36:17
known [4] - 11:1,
   23:16, 30:20, 30:23

## L

ladies [5] - 3:2, 40:17,
   41:25, 45:5, 58:9
lady [2] - 45:2, 49:5
K.L. [3] - 32:1, 34:7,
   36:16
K.L. [2] - 18:6,
   26:17
large [2] - 22:19,
   34:17
largest [1] - 17:18
last [7] - 19:23, 24:7,
   25:11, 31:10, 33:14,

50:10, 54:4
**lasts** [2] - 37:15, 56:16
**Lauderdale** [1] - 1:18
**law** [8] - 7:4, 12:10, 16:15, 16:23, 19:5, 20:4, 39:4
**Law** [1] - 1:16
**lawyer** [1] - 47:7
**laying** [1] - 8:10
**learn** [1] - 31:21
**learned** [1] - 15:9
**learning** [2] - 15:20, 18:6
**least** [2] - 12:8, 58:8
**leave** [10] - 27:18, 27:23, 31:17, 44:20, 44:23, 53:17, 53:18, 53:20, 53:25, 58:7
**leaving** [2] - 27:19, 28:3
**led** [1] - 17:11
**left** [2] - 8:14, 27:24
**legal** [2] - 48:19, 48:25
**legislation** [1] - 7:23
**length** [1] - 33:8
**less** [1] - 55:11
**lesson** [1] - 31:20
**level** [2] - 6:18, 52:5
**L.S.** [2] - 35:5, 36:23
**life** [9] - 9:15, 10:22, 18:8, 26:16, 27:5, 27:14, 31:8, 33:3
**life-shattering** [1] - 18:8
**lifetime** [3] - 18:14, 22:22, 22:25
**likelihood** [1] - 55:15
**likely** [1] - 37:20
**lined** [1] - 28:3
**listening** [2] - 15:20, 27:21
**literal** [1] - 54:16
**literally** [1] - 33:20
**literature** [1] - 4:3
**live** [2] - 3:19, 3:20
**living** [1] - 28:11
**lobby** [1] - 19:15
**local** [1] - 50:2
**located** [1] - 21:5
**locked** [1] - 54:17
**logic** [1] - 27:2
**logical** [1] - 11:2
**London** [7] - 5:20, 5:22, 6:1, 6:2, 7:7, 17:14, 21:6
**long-term** [1] - 35:25
**look** [7] - 11:1, 31:21, 32:20, 35:3, 35:7, 35:10, 56:11

**looked** [6] - 16:5, 31:18, 35:23, 38:11, 40:2, 40:5
**looking** [5] - 24:14, 31:17, 31:19, 32:1, 32:19
**looks** [1] - 32:16
**Love** [1] - 42:12
**love** [5] - 10:14, 36:1, 43:17, 55:12, 57:15
**loved** [2] - 35:15, 57:8
**loves** [1] - 10:12
**loving** [1] - 10:25, 27:21

## M

**magistrate** [2] - 17:16, 26:21
**mail** [4] - 35:13, 38:14, 40:6, 57:7
**maintain** [1] - 12:4
**major** [3] - 4:2, 15:17, 47:20
**male** [1] - 15:7
**man** [4] - 19:6, 19:7, 42:10, 49:24
**managed** [1] - 17:20
**marines** [1] - 13:10
**MARKED** [2] - 2:10
**Mary** [1] - 9:13
**massacre** [1] - 16:17
**master's** [1] - 11:11
**material** [2] - 42:4, 42:5
**matter** [1] - 59:5
**matters** [1] - 33:12
**T.J.M.** [3] - 34:3, 36:13, 53:21
**McCARN** [2] - 1:21, 59:8
**mean** [17] - 22:1, 23:13, 40:3, 40:6, 40:9, 40:11, 48:11, 49:12, 49:20, 49:22, 56:24, 57:2, 57:4, 57:8, 57:9, 57:16, 57:18
**meaning** [2] - 37:11, 49:16
**meaningful** [1] - 22:24
**means** [6] - 21:17, 21:18, 22:2, 23:10, 23:17, 32:4
**mechanically** [1] - 32:5
**media** [1] - 16:24
**medical** [10] - 4:8, 4:24, 4:25, 5:8, 5:10, 12:3, 12:8, 19:4,

20:6, 56:10
**Medical** [3] - 4:9, 4:13, 14:18
**medication** [1] - 5:9
**medicine** [3] - 4:14, 4:22, 18:1
**meet** [1] - 19:17
**meeting** [1] - 33:18
**member** [4] - 6:4, 14:25, 18:12, 20:5
**members** [2] - 18:15, 18:17
**memories** [2] - 47:22
**men** [1] - 15:19
**Mental** [6] - 6:8, 6:11, 6:20, 7:10, 7:25, 52:13
**mental** [14] - 6:9, 6:19, 6:21, 7:8, 7:22, 7:24, 8:4, 8:5, 8:17, 12:9, 16:15, 25:5, 52:5
**mentally** [1] - 15:25
**mention** [1] - 10:3
**mentioned** [9] - 9:13, 16:10, 22:21, 29:2, 29:19, 29:25, 54:12
**Mercy** [1] - 8:16
**messages** [1] - 39:6
**metabolism** [1] - 49:4
**metaphor** [1] - 49:13
**methods** [1] - 17:23
**Metropolitan** [1] - 5:25
**MIAMI** [1] - 1:2
**Miami** [8] - 1:3, 1:13, 1:22, 1:23, 3:21, 51:1, 59:9, 59:9
**Michigan** [7] - 3:20, 8:2, 8:15, 11:23, 11:25, 12:10, 12:12, 18:24, 19:1, 19:22, 21:3, 25:5, 41:16, 41:18, 52:3, 52:6
**mid-70s** [2] - 5:15, 28:18
**might** [6] - 15:12, 26:8, 26:9, 33:25, 54:3, 56:6
**military** [4] - 15:18, 21:9, 32:6, 45:13
**mind** [1] - 55:20
**mine** [1] - 9:11
**Minister** [1] - 18:11
**minority** [1] - 15:3
**MISCELLANEOUS** [1] - 2:16
**missed** [2] - 35:15, 57:9
**missing** [1] - 29:10
**mixture** [1] - 32:19

**modified** [1] - 9:8
**molested** [1] - 29:6
**Moluccan** [1] - 17:19
**moment** [7] - 9:21, 11:19, 24:7, 31:15, 54:4, 57:19, 57:21
**money** [5] - 19:11, 19:16, 30:3, 50:23, 51:4, 51:16
**month** [1] - 24:10
**months** [2] - 34:7, 34:9
**T.C.M.** [2] - 32:18, 34:9
**moral** [2] - 13:12, 49:20
**morally** [1] - 13:7
**morning** [3] - 32:18, 36:23, 58:16
**most** [6] - 8:22, 14:18, 16:15, 22:24, 31:22, 32:7
**mother** [1] - 27:3
**move** [5] - 8:1, 25:21, 26:13, 26:24, 47:2
**moved** [2] - 21:5, 58:5
**MR** [16] - 3:11, 25:21, 26:2, 40:14, 41:2, 42:16, 42:22, 43:1, 43:6, 47:1, 47:4, 50:9, 50:10, 50:13, 58:5, 58:17
**MRIs** [1] - 24:14
**multiple** [1] - 50:21
**Munich** [1] - 16:16
**murdered** [2] - 19:6, 20:5

## N

**name** [2] - 3:14, 42:11
**narrowly** [1] - 43:23
**nation** [1] - 10:15
**National** [11] - 6:8, 6:11, 6:24, 7:10, 7:20, 7:25, 15:2, 16:12, 19:13, 22:18, 52:12
**national** [2] - 19:14, 22:19
**nature** [1] - 18:11
**near** [1] - 3:18
**need** [6] - 13:25, 16:1, 28:10, 45:6, 46:7, 55:12
**needs** [1] - 14:8
**negative** [1] - 37:12
**negotiating** [1] - 7:9
**negotiation** [2] - 7:3, 16:22

**nervous** [1] - 30:17
**never** [9] - 40:7, 40:9, 40:11, 56:25, 57:2, 57:4, 57:10
**new** [4] - 8:25, 13:8, 15:23, 23:12
**New** [2] - 3:18, 21:5
**newspapers** [1] - 33:16
**next** [1] - 51:8
**night** [1] - 44:25
**nightmares** [1] - 47:22
**NO** [1] - 1:2
**nobody** [1] - 17:10
**nonprofit** [1] - 22:19
**normal** [1] - 26:7
**normally** [1] - 43:10
**north** [1] - 17:18
**North** [2] - 1:22, 59:9
**Northeast** [1] - 1:13
**notes** [1] - 14:6
**numb** [1] - 24:17
**number** [2] - 7:12, 56:18
**numbing** [1] - 47:24

## O

**O-C-H-B-E-R-G** [1] - 3:16
**obedience** [1] - 57:16
**obedient** [1] - 11:10
**objection** [2] - 42:16, 47:1
**observed** [2] - 38:7, 38:8
**occur** [2] - 49:1, 49:2
**occurred** [3] - 43:5, 45:21, 48:19
**occurs** [3] - 43:24, 44:1, 55:17
**Ochberg** [22] - 2:5, 3:3, 3:12, 3:16, 3:17, 3:24, 11:20, 21:15, 23:2, 24:19, 25:22, 26:3, 29:13, 31:9, 40:15, 41:3, 41:5, 47:2, 50:14, 51:25, 53:1, 58:2
**OCHBERG** [1] - 3:5
**OF** [2] - 1:1, 1:3
**office** [1] - 12:6
**Office** [1] - 1:16
**OFFICER** [3] - 40:19, 40:22, 58:13
**officers** [1] - 7:4
**offices** [1] - 21:6
**Official** [1] - 59:8
**official** [1] - 1:21
**often** [7] - 11:11,

29:23, 30:16, 31:2, 31:19, 49:18, 51:18
**Ohio** [2] - 25:11, 50:2
**old** [1] - 34:5
**older** [1] - 28:18
**OLIVIA** [1] - 1:11
**olivia.choe@usdoj. gov** [1] - 1:14
**Olympics** [1] - 16:17
**ON** [1] - 3:10
**on-the-record** [1] - 38:21
**once** [2] - 24:10, 25:7
**one** [28] - 4:21, 10:12, 10:13, 11:8, 11:15, 14:22, 16:11, 18:12, 18:15, 19:25, 21:1, 21:13, 22:2, 22:24, 24:7, 25:9, 25:11, 28:18, 28:23, 35:22, 35:23, 36:23, 44:19, 45:19, 46:17, 51:8, 56:13, 57:19
**one's** [1] - 48:3
**opinion** [7] - 23:19, 38:1, 38:2, 38:12, 38:15, 39:10, 55:10
**opportunity** [2] - 8:18, 28:16
**opposed** [1] - 6:10
**opposite** [2] - 11:13, 36:1
**options** [1] - 56:8
**oral** [1] - 21:20
**order** [2] - 8:16, 51:21
**organization** [5] - 18:10, 19:19, 19:24, 22:12, 22:19
**Organization** [1] - 22:18
**organizations** [5] - 16:9, 17:1, 19:14, 45:24, 46:1
**original** [1] - 10:6
**outburst** [1] - 37:18
**outcalls** [1] - 44:24
**outside** [5] - 10:23, 28:24, 41:25, 42:18, 53:11
**overcome** [1] - 30:11
**overseas** [2] - 17:14, 33:17
**oversee** [1] - 20:2
**own** [6] - 12:5, 14:19, 21:11, 30:15, 31:4, 56:21

## P

**p.m** [11] - 1:5, 3:1, 3:4,

40:20, 40:21, 40:23, 58:8, 58:14, 58:18
**Page** [1] - 2:17
**Pages** [1] - 1:7
**paid** [6] - 41:10, 41:21, 46:20, 50:25, 51:14, 51:19
**paper** [1] - 17:18
**papers** [1] - 18:13
**paradox** [1] - 57:14
**pardon** [1] - 26:17
**parent** [4] - 55:24, 55:25, 56:1
**parents** [2] - 19:6, 49:15
**part** [14] - 6:7, 6:9, 6:10, 9:8, 11:20, 12:9, 28:1, 31:23, 35:24, 36:3, 44:5, 55:11, 55:13
**part-time** [1] - 11:20
**particular** [4] - 23:25, 35:1, 43:23, 48:4
**particularly** [4] - 7:2, 12:1, 16:17, 16:20
**partner** [1] - 11:7
**partnership** [1] - 40:1
**parts** [2] - 12:15, 24:14
**party** [2] - 45:6, 45:7
**pass** [1] - 21:20
**passes** [1] - 47:19
**past** [3] - 31:16, 48:10, 58:8
**patients** [12] - 9:16, 12:6, 12:12, 13:20, 14:10, 31:22, 41:8, 50:17, 50:19, 50:21, 57:22, 57:24
**PATRICK** [1] - 1:6
**pattern** [2] - 15:24, 36:3
**pay** [8] - 7:2, 10:16, 14:21, 46:21, 46:23, 50:23, 50:24, 51:18
**paying** [2] - 30:15, 52:23
**pays** [1] - 41:19
**peer** [6] - 23:7, 23:9, 23:13, 23:17, 23:18, 23:19
**peer-reviewed** [4] - 23:7, 23:13, 23:18, 23:19
**peers** [5] - 18:15, 22:12, 22:25, 23:18, 23:21
**people** [34] - 7:5, 7:9, 8:10, 9:2, 9:19, 9:22, 10:10, 12:15, 12:19,

12:22, 12:25, 13:3, 13:6, 13:14, 14:18, 15:21, 17:15, 17:19, 17:21, 18:5, 19:5, 20:1, 23:15, 26:7, 26:10, 30:11, 32:7, 33:24, 33:25, 34:1, 35:25, 38:9, 49:14, 54:13
**people's** [1] - 56:14
**perceived** [4] - 43:9, 43:10, 43:11, 44:18
**perfectly** [1] - 26:7
**period** [4] - 10:23, 34:18, 44:19, 49:25
**permissible** [1] - 48:20
**permission** [1] - 26:14
**perpetrator** [1] - 28:22
**perpetrators** [1] - 10:10
**person** [20] - 10:1, 11:9, 16:15, 24:15, 26:15, 26:23, 27:20, 28:13, 28:22, 29:1, 29:20, 31:1, 35:22, 38:5, 46:17, 49:18, 49:22, 54:18, 57:19
**person's** [2] - 37:6, 55:10
**personal** [1] - 17:11
**personality** [3] - 15:13, 49:4, 56:8
**persons** [1] - 26:15
**perspective** [1] - 33:9
**perspectives** [2] - 43:12, 43:13
**pet** [1] - 11:10
**PFLP** [1] - 45:24
**Ph.D.'s** [1] - 5:9
**phase** [1] - 36:6
**phasing** [1] - 6:22
**philanthropist** [1] - 20:25
**phone** [3] - 10:15, 29:15, 39:6
**photographs** [1] - 38:20
**phrase** [1] - 45:14
**physical** [1] - 49:15
**physically** [2] - 12:23, 20:18
**picketed** [1] - 15:14
**pictures** [1] - 40:6
**pieces** [1] - 23:19
**piss** [1] - 26:17
**place** [4] - 27:19, 30:25, 51:1, 56:12
**Plaintiff** [1] - 1:4
**play** [1] - 45:6

**played** [1] - 15:17
**point** [9] - 5:12, 5:13, 10:25, 27:16, 46:25, 52:10, 53:25, 54:7, 55:2
**Police** [1] - 5:25
**police** [6] - 5:25, 16:15, 16:19, 21:10, 28:16, 28:23
**population** [1] - 34:17
**portal** [2] - 41:12, 41:14
**position** [3] - 6:18, 7:11, 7:13
**positive** [4] - 10:18, 11:13, 26:25, 36:2
**positively** [1] - 27:3
**possible** [1] - 57:14
**post** [2] - 29:20, 56:20
**posttraumatic** [12] - 9:1, 9:3, 12:2, 16:4, 47:16, 47:18, 48:5, 48:12, 48:15, 48:21, 48:22, 56:11
**pot** [1] - 26:17
**POW** [1] - 33:17
**power** [3] - 11:9, 55:17, 55:18
**practice** [3] - 12:5, 12:11, 14:22
**practicing** [1] - 52:1
**practitioners** [2] - 18:10, 19:20
**predator** [1] - 49:21
**predators** [4] - 49:19, 49:20, 49:21
**pregnant** [1] - 27:18
**prejudicial** [1] - 15:12
**prepare** [1] - 49:7
**prescribe** [1] - 5:8
**presence** [3] - 42:18, 43:10, 49:18
**preserving** [1] - 10:22
**prevented** [1] - 30:24
**previously** [1] - 39:3
**Prime** [1] - 10:15
**prison** [3] - 10:9, 25:13, 25:14
**private** [2] - 12:5, 12:11
**pro** [1] - 51:19
**problem** [1] - 14:8
**problems** [1] - 48:2
**proceed** [1] - 25:24
**proceedings** [3] - 3:1, 58:18, 59:4
**Proceedings..............**
**............................** [1] - 2:17
**produce** [1] - 55:9

**professional** [3] - 18:9, 22:12, 41:7
**professor** [2] - 11:20, 11:22
**profit** [2] - 46:18, 51:23
**profits** [8] - 46:6, 46:8, 46:11, 46:15, 46:16, 46:20, 46:21
**program** [3] - 4:24, 7:7, 8:19
**programs** [1] - 21:1
**progressed** [1] - 6:14
**prostitute** [1] - 30:3
**prostitution** [7] - 14:12, 30:1, 36:11, 36:18, 36:21, 46:8, 46:11
**protect** [1] - 19:15
**provided** [2] - 19:2, 42:4
**providers** [1] - 19:17
**Psychiatric** [2] - 14:16, 14:20
**psychiatric** [3] - 5:1, 12:3, 13:25
**psychiatrist** [8] - 15:7, 15:16, 16:15, 21:15, 27:20, 30:11, 30:13, 52:1
**psychiatrists** [3] - 5:8, 14:20, 15:4
**psychiatry** [9] - 4:25, 5:7, 5:16, 7:7, 11:22, 12:5, 18:1, 18:2, 52:9
**Psychiatry** [2] - 5:21, 21:24
**psychological** [5] - 24:1, 37:8, 37:16, 55:7, 55:8
**psychologically** [2] - 13:4, 20:20
**psychologist** [1] - 13:24
**psychologists** [3] - 5:9, 14:4, 18:4
**psychology** [3] - 5:7, 18:3
**Psychotherapy** [1] - 24:3
**PTSD** [4] - 9:4, 9:7, 10:2, 15:18
**public** [2] - 7:14, 7:24
**Public** [7] - 4:15, 4:16, 4:18, 6:7, 7:20, 17:13, 52:13
**published** [1] - 23:18
**punished** [1] - 37:18
**punishment** [1] -

37:12
**put** [3] - 9:10, 15:12, 32:7

## Q

**Qaida** [6] - 45:11, 45:12, 45:18, 45:20, 45:22, 45:25
**Qualifications** [1] - 2:5
**QUALIFICATIONS** [1] - 3:10
**qualify** [2] - 25:19, 25:22
**quarterly** [1] - 14:6
**questions** [5] - 40:14, 42:21, 50:9, 56:18, 58:1
**quickly** [1] - 58:5

## R

**raise** [1] - 3:3
**raised** [5] - 19:11, 29:12, 49:13, 49:14, 49:16
**ran** [1] - 34:11
**random** [1] - 37:6
**range** [1] - 17:21
**rape** [3] - 8:24, 19:6, 48:9
**raped** [9] - 11:6, 15:21, 29:9, 33:4, 36:13, 40:7, 53:22, 57:2, 57:10
**rare** [2] - 30:7, 30:8
**rate** [3] - 41:5, 41:7
**rather** [3] - 9:19, 21:2, 32:14
**read** [4] - 17:9, 17:10, 38:22, 42:14
**reading** [2] - 14:6, 42:20
**real** [2] - 12:14, 54:8
**realize** [2] - 31:23, 39:25
**realized** [1] - 10:19
**really** [6] - 6:9, 9:10, 10:14, 29:11, 35:23, 53:16
**receive** [2] - 22:10, 22:17
**received** [5] - 18:13, 22:7, 22:20, 42:5, 46:19
**recently** [2] - 20:24, 25:10
**recess** [2] - 40:18, 40:21

**reciprocated** [1] - 10:17
**recognition** [1] - 22:25
**recognize** [2] - 21:9, 21:11
**recognizing** [1] - 26:6
**record** [2] - 3:15, 38:21
**recover** [1] - 55:12
**RECROSS** [1] - 2:3
**recruited** [1] - 8:2
**Red** [3] - 17:17, 45:24, 45:25
**REDIRECT** [2] - 2:3, 50:12
**reduce** [1] - 7:17
**reenforcement** [1] - 37:12
**referred** [1] - 47:5
**refining** [1] - 7:8
**reflects** [1] - 43:7
**regret** [1] - 31:22
**reinforced** [1] - 37:11
**reinforcement** [1] - 37:10
**relate** [1] - 44:9
**related** [1] - 22:15
**relations** [1] - 7:21
**relationship** [5] - 10:17, 11:6, 17:11, 27:16, 53:16
**relationships** [13] - 12:20, 12:23, 13:1, 13:4, 13:7, 13:21, 16:23, 20:14, 35:25, 43:17, 44:8, 44:10, 48:16
**relatively** [5] - 8:25, 15:23, 19:3, 36:8, 36:21
**relatives** [1] - 17:10
**released** [1] - 10:9
**relevant** [3] - 23:15, 52:9, 52:11
**reluctance** [1] - 50:6
**rely** [1] - 42:19
**remember** [8] - 28:18, 53:8, 53:12, 53:22, 54:20, 56:4, 56:21, 58:11
**reminders** [2] - 47:24, 47:25
**renewed** [1] - 7:23
**repeat** [3] - 41:6, 45:14, 46:7
**report** [2] - 16:25, 49:7
**REPORTED** [1] - 1:21
**Reporter** [2] - 1:21, 59:8

**Reporter's** [1] - 2:18
**reports** [3] - 14:7, 38:19, 38:21
**representative** [1] - 6:24
**reputation** [1] - 52:25
**research** [3] - 23:15, 24:12, 37:8
**researchers** [1] - 18:10
**reserving** [1] - 43:19
**residency** [3] - 4:22, 6:6, 21:18
**resident** [2] - 5:1, 17:7
**residential** [1] - 8:19
**residents** [2] - 8:22, 12:3
**resisting** [1] - 28:20
**resolve** [1] - 10:22
**respect** [2] - 34:21, 55:20
**respond** [3] - 16:19, 33:24, 33:25
**responder** [1] - 21:10
**response** [1] - 48:3
**responsible** [6] - 6:21, 7:21, 8:4, 8:11, 9:17
**result** [2] - 37:16, 48:1
**retained** [2] - 48:8, 51:6
**retainer** [1] - 50:14
**retardation** [1] - 8:5
**review** [6] - 13:24, 20:9, 23:15, 23:17, 23:21, 38:19
**reviewed** [8] - 23:7, 23:9, 23:13, 23:14, 23:17, 23:18, 23:19, 39:3
**reviewing** [2] - 14:3
**reward** [1] - 37:11
**rise** [3] - 40:19, 40:22, 58:13
**robber** [2] - 10:6, 10:17
**robbers** [1] - 10:16
**robbery** [1] - 10:5
**robbing** [1] - 10:7
**J.R.** [1] - 38:18
**role** [7] - 6:14, 8:8, 9:16, 15:6, 15:17, 16:7
**roles** [1] - 15:5
**romantic** [1] - 27:9
**Rome** [2] - 17:16, 26:21
**ROWE** [7] - 1:16, 41:2, 42:22, 43:1, 43:6, 47:4, 50:9
**Rowe** [6] - 1:16,

40:25, 41:4, 43:23, 48:22, 56:18
**ROY** [1] - 1:12
**RPR** [2] - 1:21, 59:8
**rule** [2] - 20:11, 55:22
**rules** [1] - 55:21
**run** [8] - 13:11, 29:19, 29:23, 37:24, 38:4, 38:5, 56:23, 58:6
**running** [1] - 38:3

## S

**sadder** [1] - 31:20
**safe** [7] - 26:10, 30:25, 31:8, 33:13, 36:7, 54:18
**San** [1] - 4:15
**sat** [1] - 38:17
**saw** [4] - 40:1, 42:3, 45:5, 46:16
**scary** [2] - 21:20, 22:2
**scenario** [2] - 54:3
**scenarios** [1] - 33:23
**scholarly** [1] - 48:14
**school** [5] - 4:8, 12:8, 19:4, 19:5, 21:3
**School** [2] - 4:9, 4:13
**science** [4] - 23:11, 24:12, 24:14, 33:14
**Scotland** [4] - 5:20, 5:24, 7:6, 17:20
**C.S.** [1] - 34:11
**seated** [3] - 3:2, 3:8, 40:24
**second** [1] - 7:19
**Secret** [2] - 7:15, 7:18
**secretary** [1] - 52:5
**SECURITY** [3] - 40:19, 40:22, 58:13
**Security** [1] - 6:24
**see** [19] - 12:6, 14:7, 28:21, 30:13, 33:19, 35:1, 35:9, 36:14, 36:17, 38:21, 38:24, 41:25, 44:2, 46:16, 46:18, 48:24, 50:19, 58:12, 58:15
**seeing** [1] - 21:12
**seemingly** [1] - 37:5
**sees** [1] - 43:16
**self** [1] - 55:12
**self-love** [1] - 55:12
**senior** [2] - 17:16, 26:21
**sensations** [1] - 47:23
**sense** [3] - 13:15, 15:22, 32:9
**sensitive** [1] - 21:4
**sent** [4] - 7:6, 25:13,

35:14, 57:7
**sentencing** [1] - 25:15
**series** [1] - 24:1
**serious** [1] - 15:11
**serve** [1] - 20:9
**served** [4] - 19:11, 20:7, 21:13, 23:23
**Service** [8] - 4:15, 4:16, 4:18, 6:7, 7:15, 7:18, 17:14, 19:24
**service** [2] - 7:14, 8:17
**servicemen** [1] - 13:9
**Services** [2] - 6:21, 19:22
**services** [5] - 8:11, 19:2, 19:15, 19:18, 20:6
**set** [1] - 12:1
**sets** [1] - 42:23
**seven** [1] - 4:19
**several** [5] - 14:25, 21:1, 23:23, 27:5, 47:5
**severe** [1] - 36:1
**sex** [4] - 48:15, 48:19, 48:25, 55:25
**sexual** [1] - 49:15
**sexually** [3] - 13:1, 20:16, 29:5
**shackled** [1] - 27:25, 29:20
**Shafer** [1] - 22:17
**shame** [1] - 31:22
**sharing** [4] - 46:6, 46:8, 46:11, 46:15, 46:16, 46:18
**shattering** [1] - 18:8
**Sherlock** [1] - 6:3
**shifts** [1] - 28:5
**shock** [2] - 37:12, 37:13
**shocks** [1] - 37:14
**shortly** [1] - 36:10
**shot** [1] - 19:6
**shy** [1] - 30:17
**sic** [2] - 9:13, 47:16
**Sickness** [1] - 42:12
**side** [1] - 21:25
**sidebar** [2] - 42:18, 43:5
**siege** [1] - 17:20
**signature** [1] - 13:25
**significance** [1] - 55:20
**signing** [1] - 14:6
**similar** [3] - 32:24, 43:25, 55:23
**simply** [1] - 13:17
**Sisters** [2] - 8:16, 9:12

**sit** [1] - 20:11
**sitting** [1] - 31:11
**situation** [5] - 10:22, 13:11, 32:6, 43:15, 44:18
**situations** [11] - 7:9, 11:8, 14:2, 31:17, 32:13, 32:25, 36:9, 43:9, 43:25, 44:13, 44:16
**six** [2] - 10:10, 20:1
**skills** [1] - 7:9
**Skype** [1] - 12:16
**slavery** [1] - 55:23
**small** [2] - 19:3, 43:11
**smaller** [1] - 22:15
**social** [4] - 13:24, 14:5, 18:3, 18:4
**Society** [5] - 17:25, 18:9, 22:16, 22:23, 24:9
**soldier** [3] - 56:11, 56:12
**soldiers** [1] - 13:10
**someone** [5] - 20:9, 27:15, 28:24, 55:12, 55:18
**sometimes** [14] - 13:10, 27:19, 30:21, 31:21, 32:5, 39:24, 39:25, 47:22, 47:23, 51:16, 51:18, 53:11, 56:9
**son** [1] - 26:21
**sooner** [1] - 34:20
**sorry** [3] - 37:1, 50:10, 50:11
**sort** [1] - 34:14
**sources** [1] - 7:17
**SOUTHERN** [1] - 1:1
**Spaghetti** [1] - 17:20
**speaking** [2] - 51:6, 51:20
**special** [2] - 12:14, 27:11
**specialties** [1] - 14:19
**specialty** [5] - 4:25, 18:1, 18:2, 52:11
**spectrum** [2] - 34:19, 35:24
**spell** [1] - 3:14
**spend** [1] - 7:14
**spending** [2] - 28:17, 33:17
**sponsor** [1] - 15:3
**sponsored** [1] - 17:13
**spreadsheets** [1] - 39:16
**ST** [1] - 1:6
**staff** [2] - 9:18, 20:10

**standards** [1] - 17:1
**Stanford** [4] - 5:1, 5:2, 6:6, 17:8
**start** [2] - 26:7, 58:11
**started** [3] - 6:16, 26:6, 30:2
**startle** [1] - 48:3
**state** [7] - 3:14, 8:11, 16:18, 19:24, 20:4, 24:22, 50:2
**State** [3] - 11:23, 11:25, 52:3
**statements** [3] - 38:21, 39:4, 39:11
**states** [1] - 8:3
**STATES** [3] - 1:1, 1:3, 1:9
**States** [7] - 1:12, 4:15, 4:16, 4:18, 6:22, 12:16, 59:8
**status** [3] - 55:17, 55:18, 55:24
**statute** [1] - 47:8
**stay** [3] - 28:1, 28:4, 28:13
**stayed** [2] - 10:11, 27:22
**staying** [2] - 34:18
**stays** [1] - 11:7
**Steinem** [1] - 15:15
**STEPHANIE** [2] - 1:21, 59:8
**Stephanie_McCarn @flsd.uscourts. gov** [1] - 1:24
**still** [4] - 6:18, 30:16, 33:19, 35:15
**Stockholm** [34] - 9:23, 9:25, 10:6, 11:1, 11:4, 11:15, 17:22, 18:18, 23:4, 25:1, 25:23, 26:6, 26:25, 32:7, 32:15, 34:21, 38:6, 42:12, 43:2, 43:8, 43:16, 43:19, 43:20, 43:21, 43:23, 44:1, 44:2, 44:5, 44:12, 44:20, 45:10, 45:16, 52:21, 54:2
**stomach** [1] - 27:18
**stop** [1] - 39:25
**story** [1] - 21:9
**strangled** [2] - 36:16, 36:23
**strapped** [1] - 56:20
**Street** [1] - 1:13
**Stress** [7] - 17:25, 18:9, 22:16, 22:23, 24:5, 24:8, 24:9
**stress** [14] - 7:17, 9:1,

9:3, 12:2, 16:5, 24:1, 47:16, 47:18, 48:5, 48:12, 48:15, 48:21, 48:22, 56:12
**stricken** [1] - 47:3
**strictly** [1] - 12:12
**strike** [1] - 47:2
**strong** [2] - 13:15, 28:2
**stronger** [1] - 56:13
**students** [2] - 12:3, 21:4
**studied** [2] - 57:22, 57:24
**Studies** [5] - 17:25, 18:9, 22:16, 22:23, 24:9
**study** [1] - 7:1
**subjected** [2] - 49:15, 57:17
**subjects** [2] - 12:1, 23:3
**subsequent** [1] - 37:7
**subsequently** [2] - 10:13, 10:21
**subservient** [1] - 11:10
**sudden** [3] - 11:12, 11:13, 36:1
**suddenly** [2] - 11:5, 26:8
**sued** [1] - 25:6
**suffer** [1] - 35:19
**suffered** [3] - 38:9, 54:14, 55:1
**suffering** [1] - 15:24
**Suite** [1] - 1:17
**summaries** [1] - 14:7
**supervised** [1] - 9:18
**supervisor** [1] - 13:23
**supplied** [1] - 38:20
**support** [1] - 46:10
**surgery** [1] - 4:14
**surprise** [4] - 29:17, 29:21, 30:4, 30:9
**surprising** [5] - 28:14, 29:13, 29:18, 29:24, 30:1
**survived** [1] - 19:6, 19:7
**survivors** [4] - 8:23, 8:24, 18:25, 48:8
**sustain** [1] - 37:20
**SWAT** [1] - 16:22
**Sweden** [1] - 10:6
**symposium** [1] - 18:13
**symptoms** [4] - 9:22, 16:1, 24:17, 47:21
**Syndrome** [1] - 42:13

**syndrome** [37] - 9:23, 9:25, 11:1, 11:4, 11:15, 17:22, 18:18, 18:20, 23:4, 25:1, 25:23, 26:6, 27:1, 29:14, 30:2, 32:7, 32:15, 34:18, 34:22, 38:6, 43:2, 43:8, 43:16, 43:19, 43:20, 43:21, 43:23, 44:1, 44:3, 44:5, 44:12, 45:10, 45:16, 52:22, 54:2, 55:1
**systematic** [1] - 48:9

## T

**tactics** [1] - 16:23
**taker** [1] - 10:24
**takings** [1] - 17:6
**task** [9] - 7:1, 14:15, 14:24, 15:1, 16:2, 16:4, 17:4, 17:8, 52:8
**Task** [1] - 16:12
**teach** [5] - 11:25, 12:1, 12:3, 21:3, 52:3
**teaching** [1] - 19:9
**team** [2] - 9:8, 16:22
**techniques** [3] - 7:3, 7:8, 45:12
**teenage** [1] - 26:21
**tellers** [1] - 10:7
**temper** [1] - 48:3
**temperament** [1] - 56:15
**ten** [6] - 6:13, 6:15, 7:10, 7:25, 16:14, 25:12
**T.C.M** [4] - 32:18, 34:9, 35:9, 37:1
**term** [8] - 9:23, 9:24, 13:8, 35:25, 47:15, 49:21, 54:19, 54:22
**terrible** [1] - 27:12
**terribly** [1] - 13:16
**terrified** [2] - 26:13, 36:7
**Terrorism** [1] - 16:12
**terrorism** [5] - 7:2, 16:20, 16:21, 17:9
**terrorist** [3] - 17:19, 45:24, 46:1
**terrorists** [1] - 46:3
**testified** [17] - 3:6, 24:19, 24:22, 25:3, 25:5, 25:16, 25:17, 25:18, 36:9, 36:13, 36:16, 37:24, 44:9, 49:24, 54:7, 54:10,

56:2
**testify** [9] - 7:23, 32:1, 32:18, 32:21, 43:21, 50:16, 51:23, 53:3, 54:11
**testifying** [2] - 28:1, 44:8
**testimony** [7] - 38:17, 38:24, 38:25, 41:24, 47:5, 52:15, 54:9
**text** [1] - 39:6
**THE** [21] - 1:9, 1:11, 1:16, 2:4, 2:7, 3:2, 3:7, 3:8, 25:24, 40:16, 40:17, 40:24, 42:17, 42:19, 42:25, 43:4, 47:3, 58:3, 58:4, 58:7, 58:15
**themselves** [2] - 23:16, 30:24
**therapists** [2] - 14:4, 18:4
**therapy** [1] - 20:6
**thereafter** [2] - 34:22, 36:11
**thesis** [1] - 5:9
**thick** [1] - 24:10
**third** [1] - 7:19
**thoughts** [1] - 28:6
**thousands** [6] - 14:1, 29:3, 32:24, 34:15, 39:12, 39:17
**threat** [2] - 34:22, 43:10
**threatened** [5] - 26:23, 36:17, 40:11, 57:4, 57:11
**threats** [1] - 14:11
**three** [9] - 5:3, 7:13, 8:20, 8:25, 22:9, 25:12, 34:11, 45:2, 47:20
**threshold** [1] - 47:20
**throughout** [2] - 17:2, 35:18
**T.J.M.** [3] - 34:3, 36:13, 53:21
**tied** [3] - 29:20, 56:19, 56:24
**title** [2] - 8:4, 11:22
**titled** [1] - 16:21
**today** [5] - 9:4, 39:2, 42:3, 58:6, 58:10
**together** [3] - 7:8, 8:25, 9:11
**toilet** [1] - 26:14
**tomorrow** [4] - 38:24, 58:10, 58:12, 58:15
**torture** [1] - 32:5
**touch** [1] - 29:2

**tough** [1] - 8:9
**toward** [1] - 27:3
**trained** [1] - 11:11
**training** [3] - 4:24, 5:10, 7:3
**transcription** [1] - 59:4
**trauma** [51] - 9:14, 9:22, 9:25, 11:4, 11:8, 11:15, 17:6, 18:17, 23:3, 24:13, 24:18, 24:24, 25:22, 26:4, 27:1, 27:11, 28:2, 28:4, 28:15, 28:21, 29:14, 29:18, 30:2, 30:12, 32:15, 35:19, 37:20, 38:6, 38:9, 39:13, 39:22, 43:19, 43:22, 43:24, 44:1, 44:2, 44:6, 48:24, 49:1, 52:18, 53:6, 53:18, 54:3, 54:4, 54:13, 54:14, 54:15, 54:16, 54:17, 54:23, 55:15
**Trauma** [1] - 20:23
**Traumatic** [7] - 17:25, 18:9, 22:16, 22:23, 24:5, 24:8, 24:9
**traumatic** [4] - 21:8, 47:19, 47:21, 47:24
**traumatized** [3] - 15:18, 18:5, 21:11
**traumatizes** [1] - 49:22
**traumatology** [1] - 24:24
**Traumatology** [2] - 22:11, 22:14
**traveled** [1] - 17:5
**travelling** [1] - 17:14
**treat** [3] - 9:21, 12:1, 18:22
**treated** [9] - 12:19, 12:22, 12:25, 13:3, 13:6, 13:20, 14:10, 29:25, 57:20
**treating** [1] - 32:24
**treatment** [3] - 8:19, 9:2, 24:11
**trembling** [1] - 22:3
**TRIAL** [1] - 1:8
**trial** [2] - 31:12, 38:8
**trip** [2] - 41:17, 49:9
**true** [1] - 53:5
**trust** [5] - 28:25, 29:11, 29:12, 49:11, 49:17
**trustworthy** [1] - 49:17

**truth** [1] - 15:21
**truths** [1] - 15:16
**try** [1] - 19:15
**trying** [1] - 10:21
**Twelfth** [2] - 1:22, 59:9
**twice** [1] - 25:8
**two** [3] - 7:13, 10:10, 21:19
**type** [1] - 15:24

## U

**U.S** [3] - 6:7, 7:15, 41:10
**unable** [1] - 44:20
**unbelievably** [1] - 10:12
**unconnected** [1] - 36:21
**undergoing** [1] - 33:10
**unequal** [2] - 55:17
**unexpected** [2] - 11:13, 37:14
**unfortunately** [3] - 34:17, 49:14, 58:10
**unique** [1] - 21:2
**UNITED** [3] - 1:1, 1:3, 1:9
**United** [7] - 1:12, 4:14, 4:16, 4:18, 6:22, 12:16, 59:8
**University** [5] - 4:1, 5:21, 6:6, 11:23, 52:3
**unpredicted** [1] - 11:12
**unusual** [2] - 11:15, 28:12
**up** [13] - 3:17, 5:13, 7:12, 11:10, 14:8, 16:25, 26:9, 27:8, 28:3, 29:9, 36:23, 56:24
**uses** [1] - 29:5

## V

**varieties** [1] - 56:14
**variety** [3] - 16:20, 35:24, 56:17
**various** [2] - 15:5, 27:24
**Victim** [4] - 18:24, 19:22, 19:24, 22:18
**victim** [14] - 15:23, 16:5, 19:15, 28:15, 28:20, 29:13, 29:18, 30:1, 30:20, 31:5,

43:11, 43:14
**Victim/Witness** [1] - 19:19
**victimization** [3] - 16:3, 23:3, 24:24
**victimizer** [1] - 31:6
**Victims** [1] - 19:13
**victims** [13] - 8:19, 9:13, 17:5, 19:16, 19:17, 19:18, 20:2, 21:4, 22:20, 32:12, 34:23, 37:23, 39:22
**video** [3] - 35:2, 35:5, 45:6
**videos** [5] - 35:1, 35:9, 38:11, 40:3, 40:6
**view** [1] - 48:18
**vigilance** [1] - 48:1
**violence** [8] - 8:19, 11:12, 21:7, 32:20, 33:22, 36:10, 36:20, 55:4
**violent** [1] - 37:18
**vs** [1] - 1:5

## W

**wants** [2] - 28:24, 30:13
**Washington** [1] - 3:18
**watched** [1] - 31:12
**ways** [2] - 18:7, 18:22
**weaker** [1] - 56:13
**weapons** [1] - 10:7
**week** [4] - 10:11, 51:8, 51:21
**weeks** [1] - 45:2
**Welfare** [1] - 4:18
**West** [1] - 6:19
**whole** [1] - 31:12
**wife** [1] - 11:16
**wiser** [1] - 31:20
**witness** [5] - 3:6, 24:20, 24:22, 25:14, 58:6
**WITNESS** [3] - 3:7, 40:16, 58:4
**WITNESSES** [2] - 2:4, 2:7
**woke** [1] - 36:23
**wolf** [2] - 29:12, 49:11
**wolves** [2] - 29:12, 49:13
**woman** [19] - 11:5, 18:20, 25:23, 27:15, 29:5, 29:8, 29:14, 30:2, 34:1, 34:18, 49:24, 55:1, 55:5, 55:8, 56:4, 56:7
**women** [40] - 8:23,

13:9, 15:6, 15:7, 15:10, 15:13, 15:16, 15:17, 15:19, 20:14, 25:12, 29:3, 29:4, 29:25, 31:15, 31:16, 32:13, 32:24, 33:23, 34:16, 34:17, 35:18, 36:9, 38:8, 39:15, 39:22, 40:2, 40:5, 44:19, 44:22, 44:25, 45:8, 53:7, 54:7, 55:1, 55:21, 56:19, 56:23
**word** [4] - 9:25, 32:3, 32:4, 32:14
**words** [1] - 32:8
**workers** [1] - 13:25, 14:5, 18:4
**world** [1] - 51:12
**worth** [2] - 52:25, 53:2
**wounds** [1] - 21:12
**write** [3] - 5:9, 17:7, 23:11
**writing** [2] - 16:25, 23:12
**written** [6] - 21:19, 23:3, 23:5, 23:6, 48:14, 49:7
**wrote** [3] - 9:8, 38:14, 42:12

## Y

**Yard** [4] - 5:21, 5:24, 7:6, 17:20
**year** [7] - 3:22, 4:21, 7:13, 7:14, 8:12, 17:14, 25:8
**years** [19] - 5:3, 5:4, 6:13, 6:15, 7:10, 7:25, 8:20, 12:9, 14:1, 19:3, 20:8, 21:19, 25:12, 27:5, 33:15, 34:5, 37:16, 51:25
**York** [2] - 3:18, 21:6
**young** [3] - 25:12, 41:25, 49:5
**yourself** [2] - 31:7, 49:18