**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-20914-CR-ALTONAGA(s)**

**UNITED STATES OF AMERICA**

**vs.**

**DAMION ST. PATRICK BASTON,**

　　　　　**Defendant.**
_____/

## GOVERNMENT'S REPLY IN SUPPORT OF REQUESTS FOR RESTITUTION

The United States respectfully submits this reply in support of its Notice of Requests for Restitution Pursuant to 18 U.S.C. § 1593 ("Requests" or "Req."). The defendant has not raised a single challenge to the Superseding Indictment or his conviction on all counts therein, and he does not deny that restitution to the victims of the crimes charged in Counts 1 through 3 is mandatory. Instead, the defendant – citing no applicable authority – contends first that T.J.M. and L.S. are not entitled to restitution, though they clearly suffered harm as a result of the crime charged in Count 1 of the Superseding Indictment. Second, the defendant raises a host of arguments intended to persuade the Court that, without challenging the constitutionality of the charges against him or his conviction, any restitution award stemming from extraterritorial offense conduct would nevertheless be unconstitutional, violating international law principles and the Due Process Clause, and exceeding Congress's power to regulate extraterritorial conduct under the Foreign Commerce Clause. Because both T.J.M. and L.S. fall squarely within the definition of "victim" set forth in Section 1593(c), and because Section 1596 is a constitutional

exercise of congressional authority, the Court should reject the defendant's arguments and enter

an order awarding all five victims restitution in the amounts requested by the United States.

**DISCUSSION**

I.   <u>**T.J.M. and L.S. are entitled to restitution.**</u>

       A.    ***T.J.M. and L.S. are victims entitled to restitution within the meaning of Section 1593(c)***

The defendant opposes the government's requests for restitution for victims T.J.M. and

L.S., contending that neither is a "victim" within the meaning of 18 U.S.C. § 1593(c).

Conceding that no caselaw supports his position, the defendant nevertheless argues that Congress

intended only that victims referenced in the Superseding Indictment may be entitled to

restitution.

In fact, Congress's intent can be gleaned from the language of the statutory provision at

issue, which is unambiguous, and which nowhere says that the term "victim" is limited to

individuals named in the indictment.[1]   <u>Connecticut Nat'l Bank v. Germain</u>, 503 U.S. 249, 254

(1992) ("When the words of a statute are unambiguous, then, this first canon is also the last:

'judicial inquiry is complete.'").   Section 1593(c) defines the term "victim" to mean "the

individual harmed as a result of a crime under this chapter."   T.J.M. and L.S. were both plainly

"harmed" by the defendant's conduct.   Both testified at trial about the serious physical, sexual,

and psychological abuse that they suffered at the defendant's hands, harm that the Court at

sentencing characterized as "deplorable" [DE 156, at 41 (referring to "the trial testimony of all of

---

[1] In fact, while indictments charging violations of 18 U.S.C. § 1591 often refer to the victim of the crime, there is no requirement that victims be identified in an indictment.   <u>See, e.g.</u>, <u>United States v. Belfast</u>, No. 06-20758, 2007 WL 844508, at *1 (S.D. Fla. Feb. 12, 2007), <u>aff'd</u> 2007 WL 844400 (Mar. 16, 2007) (finding no "persuasive or controlling authority which mandates victim identification in the within indictment").   Under the defendant's theory, the failure to identify a victim in the indictment would preclude any award of restitution under Section 1593(c), an absurd result clearly at odds with Congress's intent.

these victims" and recognizing that "[t]hese young women were victimized repeatedly, psychologically and physically"). Neither T.J.M. nor L.S. was, as the defendant puts it, "merely" a "witness[]" to the defendant's "demeaning and belittling and victimizing" conduct [DE 156, at 42]. They were victims of his abuse.

More specifically, and crucially, both T.J.M. and L.S. were "harmed <u>as a result of a crime under this chapter</u>." 18 U.S.C. § 1593(c) (emphasis added). In Count 1 of the Superseding Indictment, the defendant was charged with – and was ultimately convicted at trial for – sex trafficking of K.L. during a period that began in the summer of 2011 and continued until May 2012. The conduct underlying Count 1 included the defendant's forcible and coercive sex trafficking of K.L. in Australia throughout the summer and fall of 2011, continuing until mid-December 2011. The evidence at trial made clear that the defendant's use of violence, coercion, and threats in trafficking K.L. "result[ed]" in harm not only to K.L., but also to T.J.M. and L.S.

Specifically, the evidence at trial established that T.J.M. prostituted for the defendant in Australia between approximately August 15 and December 1, 2011 (<u>see</u> Req. Exh. 4). During this period, T.J.M. lived with both K.L. and the defendant and worked with K.L. as a prostitute. Similarly, L.S. prostituted for the defendant in Australia between approximately October 13 and December 16, 2011 (<u>see</u> Req. Exh. 5). She too lived with the defendant, K.L., and T.J.M., and worked with both K.L. and T.J.M. The means that the defendant employed to threaten and coerce K.L. included violent acts against T.J.M. and L.S. <u>See, e.g.</u>, DE 141, at 54 (K.L. testifying that she witnessed the defendant physically abusing T.J.M. and L.S.); DE 141, at 111-13 (K.L. testifying about the defendant punishing her and L.S. when L.S. broke one of his rules). In other words, the "coercion" that the defendant employed against K.L. included his use of violence and psychological abuse against T.J.M. and L.S. His offense conduct against K.L. –

which constituted a "crime under [Chapter 77]" – resulted in "harm" to T.J.M. and L.S.  18 U.S.C. § 1591(e)(2)(A) (defining "coercion" to include "threats of serious harm to or physical restraint against <u>any</u> person" (emphasis added)).[2]  Under the plain language of the statute, both T.J.M. and L.S. are "victims" entitled to restitution.

In opposing the government's restitution requests for T.J.M. and L.S., the defendant contends that the term "the individual," and specifically the use of the definite article "the," as employed in Section 1593(c), necessarily "limits" the term "victim" to "the persons specifically identified as victims of offenses charged in the indictment" (Response in Opposition to Requests for Restitution ("Opp.") 3).  But the cases that the defendant cites, which do not concern the statutory provision at issue, fail to support that conclusion.  In <u>United States v. Rybicki</u>, 354 F.3d 124, 138 (2d Cir. 2003) (en banc), for example, the Second Circuit considered the meaning of the term "the intangible right of honest services" in 18 U.S.C. § 1346.  The court concluded that the use of the definite article in that statutory provision meant that the term "intangible right of honest services" had "a specific meaning to Congress when it enacted the statute."  <u>Id.</u>  The court then went on to consider what "specific meaning" the term "intangible right of honest services" had and whether, in light of that meaning, the statute was unconstitutionally vague.  <u>Id.</u> at 138-42.

Nothing in <u>Rybicki</u>'s discussion of the definite article suggests that the term "the individual," as employed in Section 1593(c), is necessarily limited to the persons specified in the indictment.  Instead, the Second Circuit's analysis in <u>Rybicki</u> indicates only that through its use

---

[2] The government introduced evidence of the defendant's violent sex trafficking of T.J.M. and L.S. not only pursuant to Federal Rules of Evidence 404(b) and 413, but also as intrinsic evidence of the crime charged in Count 1.  In its motions <u>in limine</u> to admit the testimony of T.J.M. and L.S., both of which the Court granted, the government expressly argued that T.J.M.'s and L.S.'s testimony was "evidence that is directly relevant to the crime charged in Count 1 of the Superseding Indictment" [DE 52, at 14; DE 63, at 9; DE 72; DE 145, at 4, 14 (noting in granting the motions that "much of the evidence . . . is inextricably intertwined with the charged crimes")].

of the definite article, Congress indicated that it had a "specific meaning" when it referred to "the individual."   See also United States v. Kanasco, Ltd., 123 F.3d 209, 211 (4th Cir. 1997) (concluding that the use of the definite article in 21 U.S.C. § 381(e)(1) – specifying that a drug intended for export must "accord[] to the specifications of the foreign purchaser," and must not be in conflict with the "laws of the country to which it is intended for export," in order not to be deemed adulterated – indicated that Congress intended that the drugs accord with the specifications of a "specific foreign purchaser" and the laws of a "specific foreign country" (emphasis added)).

In the case of Section 1593(c), the "specific meaning" that Congress had when referring to "the individual" may easily be gleaned from the rest of the statutory provision:  Congress expressly stated that it was referring to persons "harmed as a result of a crime under this chapter."  Congress nowhere indicated that its "specific meaning" was to limit the term "victim" to only those individuals named in the charging document.[3]  Indeed, just as Congress defined the term "victim" in Section 1593(c) to mean the individual "harmed as a result of a crime under this chapter," it similarly defined the term "victim" in the Mandatory Victim Restitution Act of 1996 (the"MVRA") and the Victim and Witness Protection Act ("VWPA") as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be

---

[3] If anything, the statutory framework indicates that Congress did not intend to impose such limits on the definition of "victims" entitled to restitution.  The mandatory restitution provision set forth in Section 1593 was enacted as part of the Trafficking Victims Protection Act of 2000 (the "TVPA"). Section 103 of the TVPA, codified at 22 U.S.C. § 7102, includes the following definition of "victim of trafficking":  "a person subjected to an act or practice described in paragraph (8) or (9)."  Those paragraphs, in turn, define "sex trafficking" as "the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act," and "severe forms of trafficking in persons" as "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or (B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."  T.J.M. and L.S. plainly qualify as "victims of trafficking" under this definition.

5

ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2) (emphasis added). Courts interpreting this similar statutory language – which, like Section 1593(c), is focused upon the harm resulting from the defendant's conduct – have declined to find that the persons who qualify as "victims" entitled to restitution must be specified in the charging document. See, e.g., United States v. Dickerson, 370 F.3d 1330, 1339 (11th Cir. 2004) ("[T]he courts have held that restitution may be ordered to a victim not named in the indictment, provided that the victim was directly harmed by the defendant's criminal conduct in the course of a scheme or conspiracy." (internal quotation marks omitted, emphasis added)); United States v. Rand, 403 F.3d 489, 495 (7th Cir. 2005).

Here too, nothing in the statutory language of Section 1593(c) requires the Court to conclude that the term "victim" is limited to individuals identified in the indictment. Congress employed language indicating precisely what it wanted, which was to include within the universe of "victims" entitled to restitution those individuals – like T.J.M. and L.S. – who were harmed as a result of the violent sex trafficking for which the defendant was convicted.

### B. The MVRA also provides for restitution to sex trafficking victims

The defendant contends that the Court should ignore what he characterizes as the "more expansive" definition of "victim" contained in the MVRA and even goes so far as to contend that the MVRA cannot, as a matter of law, apply in sex trafficking cases (Opp. 3 (characterizing the MVRA as "govern[ing] restitution in several categories of cases other than sex trafficking")). To be clear: in this case, the government is seeking restitution only under Section 1593 because of the additional measure of compensable loss it allows. Compare 18 U.S.C. § 1593(b)(3)

(providing that sex trafficking victims may receive restitution for "the greater of the gross income or value to the defendant of the victim's services or labor"), with 18 U.S.C. § 3663A(a)(1) (defining compensable losses under the MVRA).  The government's reliance on Section 1593 as the basis for restitution in this case, however, does not mean that the MVRA can never apply in sex trafficking cases, nor does the government concede as much.  Indeed, for several reasons, the defendant is incorrect.

Under the MVRA, restitution is mandatory when a defendant is convicted of "a crime of violence, as defined in section 16."  18 U.S.C. § 3663A(a)(1), (c).  Here, in Counts 1 through 3 of the Superseding Indictment, the defendant was convicted of a crime of violence that involved the "use, attempted use, or threatened use of physical force against the person . . . of another" and "by its nature," a "substantial risk that physical force against the person . . . of another may be used in the course of committing the offense."  18 U.S.C. § 16; cf. United States v. Willoughby, 742 F.3d 229, 242 (6th Cir. 2014) (concluding that § 1591 was a crime of violence given "the risk of physical injury from the sex act itself; the risk of violence from johns, many of whom . . . are addicted to drugs; and, not least, the risk of violence from the pimps themselves"); United States v. Norris, 188 Fed. App'x 822, 830 (11th Cir. 2006) (concluding that violation of 18 U.S.C. § 1591 is a crime of violence for purposes of 18 U.S.C. § 3142 bond determination).  Restitution is thus mandatory under the MVRA.[4]

The defendant contends that the MVRA cannot apply because Section 1593, the mandatory restitution provision applicable in sex trafficking cases, states that it applies

---

[4] The Court has already so ruled.  The Pre-Sentence Investigation report concluded that restitution was mandatory under the MVRA [DE 123, ¶ 125].  The defendant objected to this finding [DE 112].  At sentencing, the government expressly noted that "restitution is mandatory, at least under Title 18 U.S.C. § 1593 . . . and, in addition, under the standard restitution statutes" [DE 156, at 5].  In overruling the defendant's objection, the Court held that "certainly, 18 U.S.C. § 3663A(a)(1) requires that I make restitution to the victims of the offense" [DE 156, at 11].

"[n]otwithstanding section 3663 or 3663A."  18 U.S.C. § 1593(a).  According to the defendant,

"[t]he use of a 'notwithstanding' clause indicates Congress' intent to override provisions of other

laws" (Opp. 4).  This strained reading of the term "notwithstanding" ignores the plain meaning

of the word, which Webster's defines as "in spite of," all the same," or "nevertheless."  See, e.g.,

American Bankers Ins. Group v. U.S., 408 F.3d 1328, 1332 (11th Cir. 2005) ("[W]ords are given

their ordinary, plain meaning unless defined otherwise.").  By using a "notwithstanding" clause,

Congress has simply indicated that a particular provision applies "in spite of" any contrary

provision; it does not mean that other provisions, which are not contrary, and which are also

applicable, are necessarily excluded.  In fact, in this case, both statutory provisions at issue

contain a "notwithstanding clause."  The MVRA itself provides that it applies "[n]otwithstanding

any other provision of law."  18 U.S.C. § 3663A(a)(1).  Under the defendant's logic, each

provision would override the other, and no victim of sex trafficking could ever receive restitution

– a result plainly incompatible with Congress's intent.

      In fact, in considering the MVRA and other restitution statutes that, like Section 1593,

contain a notwithstanding clause, courts have held that restitution may be governed by

overlapping statutory provisions.  In United States v. Boyd, 222 F.3d 47, 49 (2d Cir. 2000), for

example, the Second Circuit concluded that restitution was "governed by [the] overlapping

provisions" of the MVRA and 18 U.S.C. § 2327, "which provides for mandatory restitution in

cases of telemarketing fraud."  Notably, Section 2327, like Section 1593, provides that it applies

"[n]otwithstanding section 3663 or 3663A."  Courts have concluded that either the MVRA or the

discretionary provisions of the VWPA can support an award of restitution in a particular case,

despite the fact that the MVRA, like Section 1593, contains a "notwithstanding clause."  See,

e.g., United States v. Donaghy, 570 F. Supp. 2d 411, 422 (E.D.N.Y. 2008), aff'd sub nom United

States v. Battista, 575 F.3d 226 (2d Cir. 2009) (ordering restitution under both the MVRA and

VWPA); United States v. Finazzo, Case No. 10-CR-457 (RRM)(RML), 2014 WL 3818628, at

*10 (E.D.N.Y. Aug. 1, 2014) (same).

Thus, while the government is only seeking restitution under Section 1593 in this case,

the Court should reject the defendant's argument that the MVRA can never apply in sex

trafficking cases.  Forcible sex trafficking constitutes a "crime of violence," and the MVRA – in

addition to Section 1593 – accordingly provides for mandatory restitution to victims.[5]

**II.    Congress's exercise of extraterritorial jurisdiction in 18 U.S.C. § 1596 is constitutional, and K.L. is entitled to restitution for losses sustained in Australia**

The defendant opposes an award of restitution to K.L. arising from the defendant's sex

trafficking activities in Australia.   He claims that an award of restitution based upon

extraterritorial conduct would be unconstitutional.  For several reasons, his argument fails.

**A.      *Defendant has not challenged his conviction, and restitution is accordingly mandatory for the crimes of conviction, including extraterritorial sex trafficking in violation of 18 U.S.C. §§ 1591 and 1596***

In Count 1 of the Superseding Indictment, the defendant was charged with sex trafficking

K.L. through means of force, threats of force, fraud, and coercion.  Count 1 specifically alleges

that the offense conduct began in or around July 2011 and continued through on or about May

2012 [DE 36, at 1].   Count 1 further specifically charges that the offense occurred "in the

---

[5] The Court should also reject the argument that a "lone pimp" cannot engage in a "scheme" or "pattern of criminal activity" supporting the broad application of Section 3663A (Opp. 5 n.4). Section 1591 defines the term "coercion" to include "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person."  18 U.S.C. § 1591(e)(2) (emphasis added).  Nothing in that definition requires that two or more persons be involved in the scheme.  As the defendant himself points out, the term "scheme" is used in many criminal statutes, including the wire fraud and bank fraud statutes.  See 18 U.S.C. §§ 1343, 1344.  Individual defendants are frequently charged with and convicted under these statutes.  A "scheme" is simply a plan or course of action.  See, e.g., United States v. Cunningham, 679 F.3d 355, 371 (6th Cir. 2012).

Southern District of Florida, Australia, the United Arab Emirates, and elsewhere," and that it occurred in violation of Title 18, United States Code, Sections 1591(a)(1), 1591(b)(1), and 1596(a)(2).  At trial, K.L. testified about being forcibly sex trafficked by the defendant in Australia, in Dubai, in Miami, and in Dallas.  The government introduced numerous exhibits demonstrating that the defendant had prostituted K.L. in Australia, including among other things, records and photographs relating to prostitution advertisements placed on Australian websites and in Australian newspapers, spreadsheets of prostitution earnings in various Australian cities, residential lease records from places where the defendant and K.L. resided in Australia, photographs and videos of the defendant and K.L. in Australia, travel, immigration, and financial records reflecting the places where the defendant and K.L. had traveled within Australia.  All of this evidence was introduced in connection with Count 1, in which the defendant was charged with sex trafficking K.L. in Australia, and other places.

In opposing the Restitution Requests, the defendant announces, as if startled, that the government's request is based in part upon conduct that occurred "in Australia" (Opp. 6 (emphasis in original)).  The defendant then misleadingly asserts that evidence relating to the sex trafficking of K.L. in Australia during 2011 was offered by the government and admitted at trial pursuant to Federal Rule of Evidence 404(b) and was not offered as "part of the charged offense" (Opp. 6).[6]  The defendant eventually concludes – as if solving a great mystery – that "the basis

---

[6] In support of these misleading assertions, the defendant cites the Court's oral ruling on the government's motions in limine and the government's "Notice of Intent to Introduce Evidence" (Opp. 6 (citing DE 145:13 and DE 67)).  The defendant mischaracterizes the record.  The government's motions in limine [DE 52, 63] concerned the testimony not of K.L., but of T.J.M., L.S., and other victims not referenced in the Superseding Indictment.  The Notice concerned evidence relating to L.M.C., yet another of the defendant's victims.  The government expressly sought to introduce this testimony and evidence both as intrinsic evidence of the charged crimes and pursuant to Fed. R. Evid. 404(b) and 413 [DE 52:14; DE 63:9; DE 67, ¶ 7].  In admitting the evidence, the Court referred both to Rules 404(b) and 413 and the "inextricably intertwined" doctrine.  At no time did the government contend, or the Court rule, that K.L.'s testimony or the voluminous evidence of

for such a request must be 18 U.S.C. § 1596" and then proceeds to argue that an award of restitution flowing from a conviction based upon Section 1596 would be unconstitutional (Opp. 7). In other words, the defendant does not challenge his conviction on Count 1, but rather questions "whether Congress has the constitutional authority to <u>order restitution</u>" for the crime of which he was convicted (Opp. 8 (emphasis added)).[7]

Unfortunately for the defendant, under Section 1593, which is titled "Mandatory restitution," restitution is required once the defendant has been convicted of "any offense under [Chapter 77]." 18 U.S.C. § 1593(a) (providing that the court "shall order restitution"). Chapter 77 includes both Sections 1591 and 1596. As a result of his conviction on Count 1, the defendant is required to pay restitution as set forth in Section 1593. <u>See</u> <u>United States v. Cortes-Castro</u>, 511 Fed. App'x 942, 946 (11th Cir. 2013) (noting that restitution under Section 1593 is "mandated by statute" in sex trafficking cases).

### B. *Section 1596 is a constitutional exercise of Congress's authority under the Foreign Commerce Clause*

The defendant challenges a restitution award that rests in part upon extraterritorial offense conduct by arguing that such an award would exceed Congress's "constitutional authority" (Opp. 8). Although he couches his argument in terms of the validity of a restitution award, the defendant is really challenging Congress's authority to enact Section 1596, from which the restitution award flows. In essence, the defendant raises three arguments concerning the constitutionality of Section 1596: (1) first, he argues that Section 1596 does not comport

---

the defendant's sex trafficking of K.L. in Australia was being admitted as anything other than intrinsic evidence of the crime charged in Count 1.

[7] At no time has the defendant raised a constitutional challenge to the Superseding Indictment by filing a motion pursuant to Federal Rule of Criminal Procedure 12(b)(2) or through any other mechanism. After trial, defendant filed a motion for a new trial [DE 100] and a <u>pro se</u> motion for a mistrial [DE 101]. Neither raised a constitutional challenge to his conviction on Count 1.

with principles of international law; (2) second, he argues that Section 1596 is not a valid exercise of Congress's constitutional authority to regulate foreign commerce; and (3) third, he argues that the exercise of extraterritorial jurisdiction under Section 1596 violates Due Process. All three arguments fail.

1.  Section 1596 comports with principles of international law

While federal criminal statutes are generally presumed to apply only domestically, United States v. Banjoko, 590 F.3d 1278, 1281-82 (11th Cir. 2009), "courts will give extraterritorial effect to penal statutes where" – as here – "congressional intent is clear." United States v. MacAllister, 160 F.3d 1304, 1307 (11th Cir. 1998). Section 1596(a) expressly provides that "the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section . . . 1591" if the alleged offender is a United States citizen, a lawful permanent resident, or is present in the United States. "By its terms, the provision is exclusively targeted at extraterritorial conduct." United States v. Clark, 435 F.3d 1100, 1106 (9th Cir. 2006) (analyzing 18 U.S.C. § 2423(c)).

"Prior to giving [the statute] extraterritorial effect," the Court should also consider "whether doing so would violate general principles of international law." MacAllister, 160 F.3d at 1308. International law recognizes five general principles of customary international law supporting the exercise of criminal jurisdiction: the objective territorial, national, protective, universality, and passive personality principles. Rivard v. United States, 375 F.2d 882, 885 (5th Cir. 1967). The defendant nowhere contends that Section 1596 violates international law.[8] The

---

[8] The defendant does not raise any arguments concerning the applicability of the universality principle, under which states may "prescribe and prosecute certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism." United States v. Yunis, 924 F.2d 1086, 1091 (D.C. Cir. 1991). In arguing that Congress's authority to enact Section 1596 cannot stem from the Offenses Clause, U.S. Const. Art. I, § 8, cl. 10, the defendant does make a closely

closest that he comes is to argue, without explicitly referring to the national principle,[9] that he is not subject to jurisdiction because he "is neither a United States citizen, nor an alien admitted for permanent residence in the United States" (Opp. 13).

It is ironic that the defendant raises his status as a non-national of the United States as a reason why he might escape the jurisdiction of American federal courts when, for so many years, he sought to live the life of an American citizen.  In any event, even if the national principle does not apply in this case, "[e]xtraterritorial application of penal laws may be justified under <u>any one</u> of these five principles" of international law.  <u>McAllister</u>, 160 F.3d at 1308 n.9 (emphasis added).  Here, at a minimum, the exercise of extraterritorial jurisdiction is justified under the "objective territorial" principle, which "applies where the defendant's actions . . . produced some effect in the United States."  <u>Id.</u> at 1308 & n.10 (noting that "[c]ourts have defined the 'objective' territorial principle to permit the prohibition not only of acts occurring within the United States, but also those occurring outside the United States' boundaries that produce detrimental effects within the national territory").

The defendant recruited and enticed K.L. to work for him in Australia and – in a single course of conduct – ultimately persuaded her to travel with him to the United States and transferred money that she earned in Australia to the United States.  Once in the United States, K.L. not only suffered physical and sexual violence at the hands of the defendant, but was also was required by the defendant to recruit other women to work for him, including notably T.C.M., the victim referenced in Count 2 of the Superseding Indictment.  The defendant's offense

---

related argument that "coerced prostitution" is not a "universally condemned" crime (Opp. 9).  Because congressional authority to regulate extraterritorial sex trafficking arises under the Foreign Commerce Clause and not the Offenses Clause, however, the defendant's argument concerning the Offenses Clause is beside the point.

[9] Under the national principle, jurisdiction belongs to the sovereign whose national committed the crime.  <u>Rivard</u>, 375 F.2d at 885-86 & n.6.

conduct in Australia thus had a detrimental effect within the United States, and the "objective territorial" principle therefore applies.

Even assuming _arguendo_ that none of the principles of international law support the exercise of territorial jurisdiction in this case, the Court must nevertheless give Section 1596 effect. Courts have repeatedly held that where, as here, a statute is unambiguous, it must be given extraterritorial effect and applied to persons who violate it, even if its application would violate principles of international law. See, e.g., McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21-22 (1963) (holding that Congress may enact laws superseding "the law of nations" if "the affirmative intention of the Congress [is] clearly expressed"); United States v. Yousef, 327 F.3d 56, 93 (2d Cir. 2003) ("If a statute makes plain Congress's intent . . . then Article III courts . . . must enforce the intent of Congress irrespective of whether the statute conforms to customary international law" (internal quotation marks omitted)); Yunis, 924 F.2d at 1091 (rejecting defendant's argument that international law prohibited application of hostage-taking statute to foreigners whose conduct occurred overseas, and commenting that "[o]ur duty is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law").

2.     <u>Section 1596 is a valid exercise of Congress's power to regulate foreign commerce</u>

The defendant also contends that Congress lacks authority to order restitution based upon extraterritorial offense conduct because neither the Thirteenth Amendment nor the Foreign Commerce Clause support the exercise of extraterritorial jurisdiction in Section 1596. The Court need not consider whether Section 1596 is a constitutional exercise of power under the Thirteenth Amendment because under the Foreign Commerce Clause, Congress clearly has the power to regulate commercial sex trafficking abroad.

Article I, Section 8, Clause 3 of the Constitution provides: "The Congress shall have power . . . [t]o regulate Commerce with Foreign Nations, and among the Several States, and with the Indian tribes." The Supreme Court has construed the Foreign Commerce Clause as granting Congress with sweeping powers, unhindered by the concerns of federalism and state sovereignty that circumscribe Congress's authority to regulate interstate commerce. See, e.g., Bd. of Trs. of Univ. of Ill. v. United States, 289 U.S. 48, 56-57 (1933) (characterizing Congress's power as "exclusive and plenary" and observing that "[a]s an exclusive power, its exercise may not be limited, qualified, or impeded to any extent by state action"); California Bankers Ass'n v. Shultz, 416 U.S. 21, 46 (1974) (stating that Congress's plenary authority over foreign commerce "is not open to dispute"). "In fact, the Supreme Court has never struck down an act of Congress as exceeding its powers to regulate foreign commerce." Clark, 435 F.3d at 1113.

As courts have recognized, there is evidence that Congress's authority to regulate foreign commerce was intended by the founders to be greater than its power to regulate interstate commerce. See, e.g., United States v. Pendleton, 658 F.3d 299, 306 (3d Cir. 2011); Clark, 435 F.3d at 1102-03, 1111, 1114 (noting the "expansive latitude given to Congress over foreign commerce" and observing that "Supreme Court precedent points to the conclusion that the Foreign Commerce Clause is different than the Interstate Commerce Clause," by "granting Congress sweeping powers"). In light of this, at least one circuit court has concluded that in the Foreign Commerce Clause context, the "framework for domestic commerce" that controls when analyzing Congress's authority to regulate interstate commerce does not apply. See Clark, 435 F.3d at 1103 (concluding that "[n]o analogous framework exists for foreign commerce," that "it has never been suggested that Congress' power to regulate foreign commerce could be so limited"). Instead, the Ninth Circuit has held that in the Foreign Commerce Clause context, the

only relevant question is "whether [the statute] has a constitutionally tenable nexus with foreign commerce," or, put differently, "whether the statute bears a rational relationship to Congress's authority under the Foreign Commerce Clause." Id. at 1111, 1114.  But see Pendleton, 658 F.3d at 306 (noting that the Supreme Court "has yet to determine whether [the interstate commerce] framework applies to cases involving Congress's power to regulate pursuant to the Foreign Commerce Clause" and concluding, in an abundance of caution, that even under that framework, 18 U.S.C. § 2423(c) is a permissible exercise of congressional power).

Section 1596 clearly satisfies this broad interpretation of Congress's authority under the Foreign Commerce Clause.  In conjunction, Sections 1591 and 1596 are intended to regulate activity that is inherently commercial and economic – activity, in other words, that constitutes "commerce."  Sections 1591 and 1596 prohibit conduct that is intended to cause a person "to engage in a commercial sex act," which is further defined as "any sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(c)(1).  See Clark, 435 F.3d at 1115 (noting that the regulation of commercial sex acts under the commercial sex prong of 18 U.S.C. § 2423(c) concerns activity that is "quintessentially economic" and "thus falls within foreign trade and commerce" (internal quotation marks omitted)).

Furthermore, Sections 1591 and 1596 reach only conduct that is "in or affecting interstate or foreign commerce."  Congress's desire to regulate forcible sex trafficking outside the United States that results in coerced commercial sex and that has an effect on interstate or foreign commerce falls well within – and bears a rational relationship to – its "plenary" authority to regulate foreign commerce.  Cf. Pendleton, 658 F.3d at 311 ("[J]ust as Congress may cast a wide net to stop sex offenders from traveling in interstate commerce to evade state registration

requirements, so too may it attempt to prevent sex tourists from using the channels of foreign commerce to abuse children.").

Similarly, Sections 1591 and 1596 reach only extraterritorial conduct that (1) is carried out by an American citizen or permanent resident, or (2) is carried out by a person who is later present in the United States.  The regulation of individuals who possess American citizenship or residency rights and who engage in commercial sex trafficking outside of the United States has a "constitutionally tenable nexus" to Congress's power to regulate foreign commerce.  The regulation of individuals who engage in commercial sex trafficking outside of the United States and thereafter enter the United States also bears a "rational relationship" to Congress's authority over foreign commerce; it is constitutionally permissible for Congress to regulate the activities of those who engage in the violent, coercive sexual exploitation of other individuals outside of the United States and then make their way across its borders.

Even if the Court were to apply the interstate commerce framework to its Foreign Commerce Clause analysis, Section 1596 would still fall well within Congress's authority.  Under that framework, there are "three general categories of regulation in which Congress is authorized to engage under its commerce power": (1) "Congress can regulate the channels of interstate commerce"; (2) "Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce"; and (3) "Congress has the power to regulate activities that substantially affect interstate commerce."  Gonzales v. Raich, 545 U.S. 1, 16-17 (2005).

Under this framework, it is clear that Section 1596 falls within the scope of Congress's authority to "regulate activities that substantially affect interstate commerce."  See id. at 17 ("Our case law firmly establishes Congress' power to regulate purely local activities that are part

of an economic 'class of activities' that have a substantial effect on interstate commerce.").   The question for the Court is not "whether [the regulated activity] taken in the aggregate, substantially affect[s] [foreign] commerce in fact, but only whether a 'rational basis' exists for so concluding." Id. at 22.   Here, it was rational for Congress to conclude that an inherently commercial activity – prostitution occurring outside of the United States at the behest of individuals who were either American citizens or nationals, or later traveled to the United States – would, in the aggregate, affect foreign commerce.[10]   Unlike the statutes at issue in United States v. Lopez, 514 U.S. 549, 561 (1995), and United States v. Morrison, 529 U.S. 598, 610 (2000), which the Supreme Court concluded had "nothing to do with 'commerce' or any sort of economic enterprise," the activity regulated by Sections 1591 and 1596 – commercial sex acts – is inherently economic.  Clark, 435 F.3d at 1115.

In addition, Sections 1591 and 1596 regulate conduct that necessarily involves use of the channels of foreign commerce.  Section 1596(a)(1) applies to American citizens or permanent residents who engage in forcible sex trafficking outside of the United States.  Such persons necessarily traveled in foreign commerce to reach their foreign destinations, and thus utilized channels of foreign commerce.  Similarly, Section 1596(a)(2) applies to persons, irrespective of nationality, who engage in prohibited conduct outside of the United States and are present in the United States at the time that they are charged.  Such persons also necessarily traveled in foreign commerce and thus used the channels of foreign commerce.  Cf. Clark, 435 F.3d at 1114

---

[10] The legislative history underlying the original enactment of the Trafficking Victims Protection Act of 2000 illustrates Congress's concern with regulating international sex trafficking as a commercial activity with an effect on commerce.  See, e.g., 146 Cong. Rec. S10211-01, at S10217, 2000 WL 1509760 (Cong.Rec.) (Sen. Hutchinson noting that a single victim was smuggled into the United States and trafficked for a supposed debt of $2,200 and further noting that "at least 50,000 women and children are trafficked into the U.S. each year and at least 700,000 women and children are trafficked worldwide" and that "traffickers use international borders to trap their victims in a foreign land without passports").

(concluding that 18 U.S.C. § 2423(c), which involves travel in foreign commerce, "implicates foreign commerce to a constitutionally adequate degree"); id. at 1116 (noting that "Congress legitimately exercise its authority to regulate the channels of commerce where a crime committed on foreign soil is necessarily tied to travel in foreign commerce, even where the actual use of the channels has ceased"); Pendleton, 658 F.3d at 310 (concluding that 18 U.S.C. § 2423(c) was a valid exercise of Congress's authority to regulate foreign commerce because it involved the use of channels of foreign commerce).

Indeed, in this case, the evidence at trial – to which the defendant himself repeatedly refers – clearly demonstrated that the defendant's offense conduct involved abundant use of the channels and instrumentalities of foreign commerce.[11]  The defendant opened multiple bank accounts in the United States, into which he made deposits from K.L.'s prostitution earnings while in Australia.  The defendant transferred money from his Australian bank accounts to his bank accounts in the United States in March 2012, after he and K.L. had arrived in the United States.  The defendant effected wire transfers from the United Arab Emirates to the United States when he and K.L. traveled to Miami in February 2012.  The defendant purchased plane tickets from the U.A.E. to Miami in February 2012.  The defendant utilized his Australian bank accounts to support himself and K.L. in the spring of 2012, while they were in Miami.  It is hard to imagine a better illustration of extraterritorial sex trafficking that involved the channels and instrumentalities of foreign commerce.  Congress's authority to regulate such conduct falls within its power under the Foreign Commerce Clause.

---

[11] The defendant cites extensively to evidence admitted at trial, presumably in an attempt to argue that Section 1596 is unconstitutional because – as applied in this case – it reaches conduct that does not bear the requisite nexus to foreign commerce.  Unfortunately for the defendant, the facts of this case illustrate that Congress's regulation of extraterritorial sex trafficking reaches precisely the sort of conduct that involves substantial use of the channels and instrumentalities of foreign commerce.

3. Congress's exercise of extraterritorial jurisdiction under Section 1596 does not violate Due Process

The defendant also contends that the exercise of extraterritorial jurisdiction over his conduct in Australia violates the Due Process Clause. Specifically, he argues that there is no "constitutionally sufficient relationship" between him and the United States and that jurisdiction is therefore "arbitrary or fundamentally unfair" (Opp. 14). This argument – raised by an individual who illegally re-entered the United States multiple times after having been ordered removed, who stole the identity of an American citizen and then used that identity to obtain a United States passport, who resided in multiple cities within the United States, including Miami and Orlando, who rented apartments, stayed at hotels, and flew on planes across the United States – is specious.

It is true that courts, including the Eleventh Circuit, have recognized that Due Process requires – in cases involving extraterritorial application of penal statutes – a "sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990) (citation omitted); see also, e.g., United States v. Ibarguen-Mosquera, 634 F.3d 1370, 1378 (11th Cir. 2011); Yousef, 327 F.3d at 111. "In determining whether an extraterritorial law comports with due process, appellate courts often consult international law principles." Ibarguen-Mosquera, 634 F.3d at 1378.[12]

_____

[12] The defendant cites the "minimum contacts" test that applies when determining specific jurisdiction in civil cases under Federal Rule of Procedure 4 (Opp. 15) and argues that his contacts with the United States did not "give rise" or relate to the conduct underlying that portion of K.L.'s restitution claim relating to the defendant's conduct in Australia (Opp. 16). He cites no caselaw indicating that the "minimum contacts" test applies in the criminal context. In any event, the defendant's "contacts" with the United States both gave rise to and were related to the conduct underlying Count 1 of the Superseding Indictment. Without a United States passport, a false claim to American citizenship, and American bank accounts, it is entirely unclear that the defendant – a

In this case, it is clear that a "sufficient nexus" exists between the defendant and the United States, that application of Sections 1591 and 1596 to the defendant is neither "arbitrary" nor "fundamentally unfair," and that, as outlined above, the objective territorial principle of international law supports the exercise of jurisdiction in this case.  The defendant chose for years to live in the United States and availed himself of this country's benefits, by obtaining a United States passport and a Florida driver's license, by renting cars and leasing apartments in the United States, by opening multiple bank accounts in the United States.  During the periods charged in the Superseding Indictment, the defendant maintained his nexus with the United States by bringing K.L. to Miami and trafficking her not only in Miami but also in Dallas.  He also trafficked T.C.M. and J.R. in multiple cities across the United States.  Even while he was in Australia and Dubai (in 2011 and early 2012), the defendant utilized bank accounts he had opened in the United States to launder money that K.L. and others had earned for him through forced prostitution.  A "sufficient nexus" existed at all relevant times between the defendant and the United States.

## III.    The Government's Restitution Requests are supported by a preponderance of the evidence.

The defendant raises no objection to the methodology underlying the government's Restitution Requests, nor could he.  As set forth in the government's Requests (see Req. 5-6), the restitution amounts requested are based upon the number of weeks that the victim worked for the defendant and the amount earned each week, a methodology that has been expressly approved by the Eleventh Circuit.  See, e.g., Cortes-Castro, 511 Fed. App'x at 946; United States v. Robinson, 508 Fed. App'x 867, 871 (11th Cir. 2013).   The government's calculations are highly conservative and take into account generous allowances for the victims' living expenses.

---

Jamaican citizen with a criminal record who had been deported from the United States – could have traveled to Australia and successfully recruited K.L.

The only challenge that the defendant raises to the government's loss calculations is to argue – irrelevantly – that the "government cannot merely rely on summary charts to establish loss amounts" (Opp. 5).  Of course, the charts attached as exhibits to the government's requests are not merely summary charts.  They are based upon and cite extensively to trial testimony and trial exhibits, which the Eleventh Circuit has also expressly recognized as a proper basis for determining restitution.  See, e.g., United States v. Roberts, 464 Fed. App'x 796, 802 (11th Cir. 2012) (recognizing that restitution amounts may be "determined on the basis of evidence heard during trial, undisputed statements in the Presentence Investigation Report, or evidence presented at the sentencing hearing"); Robinson, 508 Fed. App'x at 871 (affirming restitution award in sex trafficking case based upon trial testimony that "revealed the amount charged . . . and the amount of time she worked for [the defendant").  The defendant cannot seriously dispute the evidence supporting the government's Restitution Requests.  That evidence – which consists of trial testimony and trial exhibits – more than satisfies the burden that the government bears of establishing the victim's losses by a preponderance of the evidence.  18 U.S.C. § 3664(e).

**CONCLUSION**

For the foregoing reasons, and for the reasons set forth in the government's Restitution Requests, the government respectfully requests that the Court enter an order requiring the defendant to pay restitution as set forth in the Restitution Requests.


Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:     /s/  Olivia S. Choe_____
        Olivia S. Choe
        Assistant United States Attorney
        Court ID No. A5501503
        99 N.E. 4th St., Miami, FL 33132
        T. (305) 961-9437
        F. (305) 536-4676
        E. olivia.s.choe@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on February 17, 2015, I filed the foregoing with the Clerk of

the Court via CM/ECF and thereby served all counsel of record.

<u>/s/  Olivia S. Choe</u>
Olivia S. Choe
Assistant United States Attorney